172 P.3d 1021

**EXOTICS HAWAII–KONA, INC,; Sharon Murakami, as Special Representative for the Estate of Chiaki Kato; Harvy Tomono; Andraea Partners; Arvak Agronomics, Inc.; C & L Orchids and Island Agribusiness, Ltd.; Ernest Carlbom and Donna Carlbom; Cymbidium Partners; Floral Resources/Hawaii, Inc.; Flowers, Inc.; Glenwood Cymbidium Partners; Green Point Nurseries, Inc.; Daniel Hata d/b/a Hata Farm; Hawaiian Anthuriums, Ltd.; Hawaiian Greenhouses, Inc.; Hawaiian Heart, Inc.; Albert Isa d/b/a Albert Isa Nursery; Kaimu Nursery, Inc.; Kaohe Nursery; Margaret Kincaid and Peter Kincaid d/b/a Anuenue Farms; Kona Orchids, Inc.; Kupulau Anthurium Partners; Alan Kuwahara d/b/a Puna Floriculture; James Kuwa-**

278

hara d/b/a James S. Kuwahara Farm; Yoso Kuwahara, Inc.; Henry Liljedahl; Malaai Partners; James McCully; Mitsuo Miyatake d/b/a Miyatake Farms; Curtis Nakaoka d/b/a Kona Grown Nurseries; George J. Nakashima d/b/a Nakashima Farm; Jeffrey Newman d/b/a Newman's Nurseries; Mark K. Nozaki d/b/a Nozaki Farms; Big Rock Anthuriums, Inc.; Patrick Oka d/b/a Oka Nursery; Carl Okamoto d/b/a Carl Okamoto & Lehua Tropical Flowers; Clyde Okamoto d/b/a Ho'Onanea Farms; Wade Okamoto d/b/a Paradise Anthuriums; Ronald Okazaki and Dora Okazaki d/b/a Lehua Anthurium Nursery; Neal Okimoto d/b/a Pacific Paradise Orchids; Orchid Partners; Pacific Nurseries, Inc.; Polynesian Orchids & Anthuriums, Inc.; Puna Flowers & Foliage, Inc.; Sunshine Farms; George Shiroma d/b/a G. Shiroma Farms; Masato Shiroma d/b/a Mae's Nursery; Masao Sunada; Samuel H. Taka & Sylvia A. Taka d/b/a S. Taka; Yoshio Takemoto, Midori Takemoto, Cary Takemoto, Morris Takemoto and Norman Takemoto d/b/a Takemoto Farm; Fetulima Tamasese d/b/a Pacific Kona Orchids; Harold S. Tanouye & Sons, Inc.; Henry Terada and Loraine Y. Terada d/b/a H & L Terada Farm; Vantanage Partners; Uniwai I Limited Partners; Uniwai II Limited Partners; Waiakea Partners; Dwight E. Walker, Jr. and Bernice K. Walker d/b/a Puna Ohana Flowers; Mark Willman d/b/a Hawaii Orchids; Exotics Hawaii, Ltd., Plaintiffs–Appellants/Cross–Appellees

v.

E.I. Du PONT DE NEMOURS & COMPANY; Allen Teshima; and Reginald Hasegawa, Defendants–Appellees/Cross–Appellants.

No. 27489.

Supreme Court of Hawai'i.

Nov. 21, 2007.

Melvin Y. Agena, on the briefs, Honolulu, for plaintiffs-appellants/cross-appellees.

Warren Price III, Kenneth T. Okamoto, Robert A. Marks, and Susan C. Wilson (of Price Okamoto Himeno & Lum), on the briefs, for defendant-appellee/cross-appellant, E.I. Du Pont de Nemours and Company.

MOON, C.J., LEVINSON, NAKAYAMA, JJ., and Circuit Judge LEE, In Place of DUFFY, J., Recused; ACOBA, J., Dissenting.

Opinion of the Court by MOON, C.J.

The instant action arises from product liability cases initiated by the plaintiffs-appellants/cross-appellees Albert Isa dba Albert Isa Nursery (Isa), Samuel H. Taka and Sylvia A. Taka dba S. Taka (the Takas), Mark Willman dba Hawai'i Orchids (Willman), and James McCully [hereinafter, collectively, the plaintiffs] in 1992 and 1993 against, *inter alia,* the defendant-appellee/cross-appellant E.I. du Pont de Nemours and Company (Du-Pont), alleging that contaminated Benlate, an agricultural fungicide manufactured by Du-Pont, had killed or damaged their plants and nurseries.[1] Between 1994 and 1995, the plaintiffs settled their product liability cases. In 2000, the plaintiffs commenced the instant action against, *inter alia,* DuPont, alleging that only after settling their claims did they discover that DuPont had improperly failed to reveal certain vital scientific data and information indicating that Benlate was contaminated. As such, the plaintiffs believed that DuPont was guilty of fraudulently withholding such evidence in order to induce them to settle for less than the fair value of their claims.

---

1. There were originally sixty plaintiffs in the present action; however, fifty-six plaintiffs resolved their cases against DuPont during the circuit court proceedings. Specifically, thirty-seven of the original sixty plaintiffs settled their claims against DuPont on September 27, 2002, four on September 2, 2003, and thirteen on June 24, 2005. The remaining six plaintiffs proceeded with their case to its conclusion; however, apparently two of the six plaintiffs settled their claims against DuPont inasmuch as only the instant four plaintiffs appealed to this court. Soon after the filing of the notice of appeal, the two plaintiffs that apparently settled with DuPont filed their stipulation of partial dismissal of action with prejudice. Accordingly, unless otherwise indicated, any proceedings relating to these fifty-six plaintiffs will not be mentioned in this memorandum inasmuch as they are not relevant to the disposition of the instant appeal.

In three summary judgment orders, the Circuit Court of the Third Circuit, the Honorable Ronald J. Ibarra presiding, found in favor of DuPont on all of the plaintiffs' claims. Significantly, the circuit court, without determining whether DuPont indeed committed fraud, found as a matter of law that the plaintiffs could not meet their burden of proving damages. According to the circuit court, the damages available to the plaintiffs was "the fair compromise value of the claim at the time of the settlement." A judgment, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (2007),[2] in favor of DuPont was entered on August 10, 2005.

The plaintiffs appeal—and DuPont cross appeals—from the HRCP Rule 54(b) judgment. The plaintiffs challenge, *inter alia*, the circuit court's order granting summary judgment on the basis that they were unable to prove damages. Although DuPont's position is that the HRCP Rule 54(b) judgment should be upheld, it cross appeals in apparent recognition of the possibility that this court may not agree with its position, challenging another order granting in part and denying in part DuPont's motion for summary judgment, discussed *infra*.

For the reasons stated herein, we hold that the circuit court properly granted summary judgment in favor of DuPont on the basis that the plaintiffs could not, as a matter of law, prove damages and, therefore, affirm the circuit court's August 10, 2005 judgment.

## I. BACKGROUND

This court has previously presented a brief factual summary of the underlying product liability cases in *Exotics Hawai'i–Kona, Inc. v. E.I. Dupont De Nemours & Co.*, 104 Hawai'i 358, 90 P.3d 250 (2004). However, given the resolution of this case and the fact that the instant appeal involves only four of the sixty original plaintiffs, *see supra* note 1, a concise version of the facts are provided

below as they relate only to those four plaintiffs and the pertinent summary judgment orders—specifically, the order granting summary judgment based on the plaintiffs' inability to prove damages.

### A. The Complaint

As previously mentioned, between November 1992 and March 1993, the plaintiffs, who were commercial growers, brought product liability actions against, *inter alia*, Dupont, alleging that its Benlate product was defective and that it caused damage to their plants and nurseries. In 1994 and 1995, the plaintiffs entered into individual settlement agreements with DuPont that resulted in DuPont's payment of certain sums in exchange for the execution of releases by the plaintiffs. As a result of these settlement agreements, the plaintiffs entered into stipulations to dismiss their product liability actions with prejudice.

On January 6, 2000, the plaintiffs filed an eighty-four page first amended complaint against, *inter alia*, DuPont. The plaintiffs claimed that DuPont had defrauded them "into settling for pennies on the dollar for damages" caused by its Benlate product. Specifically, the plaintiffs alleged that DuPont wrongfully, illegally, and fraudulently withheld from discovery vital scientific data and information that it was under an obligation to produce in the underlying product liability actions. The plaintiffs' first amended complaint alleged that:

208. If, at the time the [p]laintiffs accepted settlement of their underlying [product liability] claims, they had received full, fair, truthful and complete disclosure of material information, the [p]laintiffs would not have accepted the consideration offered for settlement which was substantially less than the losses which they had suffered.

209. [The p]laintiffs would have continued to press their claims if full, complete and truthful disclosures had been made. Reliance by those [p]laintiffs on full, fair and disclosure by DuPont, which in fact

---

**2.** HRCP Rule 54(b) provides in relevant part that:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court

may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

was not forthcoming, resulted in injury in the form of settlement for lower compensation than was adequate or would otherwise have been available.

The plaintiffs asserted that the "appropriate measure of recovery for said conduct is the difference between [the p]laintiffs' actual total damages (*e.g.*, crop and plant losses, soil injuries, lost market positions and lost economic advantage) and the amount, if any, previously received" from DuPont. Accordingly, the plaintiffs alleged ten counts, to wit:

| COUNT | CAUSE OF ACTION |
|---|---|
| 1 | intentional spoliation of evidence |
| 2 | negligent spoliation of evidence |
| 3 | fraud |
| 4 | fraudulent misrepresentation |
| 5 | negligent misrepresentation |
| 6 | non-disclosure [3] |
| 7 | intentional interference with prospective business advantage |
| 8 | civil conspiracy |
| 9 | violation of due process rights and rights to a fair trial as guaranteed by article I, section 4 of the Hawai'i State Constitution |
| 10 | exemplary damages |

DuPont filed its answer to the first amended complaint on February 14, 2000.[4]

## B. *Proceedings Regarding the Motions for Summary Judgment*

As previously stated, the circuit court, in three summary judgment orders, found in

3. Restatement (Second) of Torts § 551 (1977), entitled "Liability For Nondisclosure," provides in relevant part:
 (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
 (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated[:]
 (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
 (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
 (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

favor of DuPont on all of the plaintiffs' claims. However, in light of our disposition, we recount only two of the three motions, focusing especially upon the motion concerning the plaintiffs' lack of evidence to support their damages. The other motion for summary judgment is addressed *infra* in section III.A.2. as it becomes relevant to the plaintiffs' other contentions.

### 1. Motion for Summary Judgment as to All Claims

On January 8, 2004, DuPont filed a motion for summary judgment on all of the plaintiffs' claims. Relying on this court's answers to the questions certified by the United States District Court for the District of Hawai'i in *Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 73 P.3d 687 (2003) [hereinafter, *Matsuura I*],—another Benlate settlement fraud action—DuPont argued, *inter alia*, that summary judgment was proper for the non-fraud claims inasmuch as this court, in *Matsuura I*, determined that "a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings." *Id.* at 162, 73 P.3d at 700.[5] DuPont, thus, maintained that:

 (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
 (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

4. In answering the complaint, DuPont also asserted a counterclaim, seeking, *inter alia*, damages and an injunction prohibiting the plaintiffs from pursuing their action in violation of the settlement agreements, *i.e.*, the covenant not to sue. However, the circuit court has yet to resolve the counterclaim and, in fact, stayed all proceedings relating to the counterclaim pending resolution of the instant appeal.

5. Briefly stated, the plaintiffs in *Matsuura I* settled their product liability actions against DuPont, and, thereafter, brought a claim in the federal district court for, *inter alia*, fraud and

Since it is now clear in Hawai'i that, absent fraud, *immunity exists for any alleged "misconduct engaged in during prior litigation,"* ... DuPont therefore is immune from all of [the p]laintiffs' non-fraud claims because these claims are based on allegations of "misconduct engaged in during prior litigation" such as improper discovery responses, false statements of counsel, etc.

(Emphasis in original.)

■ Moreover, DuPont also argued that it was entitled to summary judgment on the fraud-based claims inasmuch as "no rational jury could conclude that these [p]laintiffs *reasonably* believed the truth of DuPont's alleged misrepresentation." (Emphasis added.) In determining whether the plaintiffs are precluded as a matter of law from bringing a cause of action for fraudulent inducement to settle, this court in *Matsuura I* "clarif[ied] that, under Hawai'i law, to prevail on a claim of fraudulent inducement, [the] plaintiffs must prove that their *reliance* upon a defendant's representations was *reasonable." Id.* at 163, 73 P.3d at 701 (emphases added).[6] DuPont argued that:

In their product liability cases, where [the p]laintiffs sued DuPont for millions of dollars claiming Benlate was defective, it was [the p]laintiffs' financial interest to claim they *knew/believed* DuPont's statements concerning the nature of and/or non-existence of [a]dverse Benlate [scientific d]ata *were false,* and that they *knew/believed* that [a]dverse Benlate [scientific d]ata existed. And, as the record of this [c]ourt demonstrates, that is exactly what

[the p]laintiffs claimed—consistently, repeatedly, and vehemently.

In *this* case, however, where [the p]laintiffs have sued DuPont for millions of dollars claiming they were "defrauded" in their product liability settlements, it is in [the p]laintiffs' financial interest to claim they *did NOT know/believe* DuPont's statements concerning the nature of and/or non-existence of [a]dverse Benlate [scientific d]ata *were false,* and that *they did NOT know/believe* that [a]dverse Benlate [scientific d]ata existed. And, as clear from [the p]laintiffs' [c]omplaint and interrogatory answers, that is exactly what they are claiming—consistently, repeatedly, and vehemently.

(Emphases and capitalization in original.)

On January 16, 2004, the plaintiffs filed their memorandum in opposition to the motion. A hearing was held on January 26, 2004, wherein the circuit court orally denied the motion to the extent that "there's a genuine issue of material fact as to the reasonableness of the fraud claims." The circuit court, however, granted the motion as to the claims of intentional and negligent spoliation of evidence (Counts 1 and 2), intentional interference with prospective economic advantage (Count 7), and violation of constitutional rights (Count 9). A written order was entered on February 25, 2004, granting in part and denying in part the motion for summary judgment. Specifically, the circuit court granted summary judgment as to the non-fraud claims, *i.e.,* Counts 1, 2, 7, and 9, and denied summary judgment as to the fraud and deceit claims, *i.e.,* fraud (Count 3), fraudulent misrepresentation (Count 4), negligent

---

interference with prospective economic advantage. 102 Hawai'i at 152, 73 P.3d at 690. The federal district court subsequently certified three questions to this court, the answers to which are discussed *infra* as applicable. *Id.* at 154, 73 P.3d at 692.

Also, during the pendency of *Matsuura I,* the circuit court in the instant case, at the request of the parties, submitted four reserved questions to this court, three of which were identical to the certified questions submitted by the federal court in *Matsuura I.* The instant case was consolidated with *Matsuura I* for purposes of oral argument and disposition. *Id.* The fourth reserved question, which is not relevant to this appeal, was

answered by this court in *Exotics Hawai'i–Kona, Inc. v. E.I. DuPont De Nemours & Co.,* 104 Hawai'i 358, 90 P.3d 250 (2004).

6. It is well-settled that,

[t]o constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but *reasonably* believed true by the other party, and (4) upon which the other party relies and acts to his or her damage.

*Id.* at 162–63, 73 P.3d at 700–01 (citations and internal brackets omitted) (emphasis added).

misrepresentation (Count 5), and non-disclosure (Count 6). The circuit court also ruled that civil conspiracy (Count 8) and exemplary damages (Count 10) "are not separate counts, but are merely derivative to [the p]laintiffs' remaining claims."

## 2. The Motion for Summary Judgment Based on the Plaintiffs' Inability to Prove Damages

On February 3, 2005, DuPont filed a motion for summary judgment based on the plaintiffs' inability to prove damages. Relying on *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457 (Del.1999), *Richardson v. Economy Fire & Casualty Co.*, 109 Ill.2d 41, 92 Ill.Dec. 516, 485 N.E.2d 327 (1985), and *Urtz v. New York Central & Hudson River Railroad Co.*, 202 N.Y. 170, 95 N.E. 711 (1911), discussed *infra*, DuPont maintained that the plaintiffs' remedies are limited to either: (1) rescinding their settlement agreements, returning any benefits they may have received, and seeking a return to the status quo ante; or (2) affirming the agreements and suing for damages in a fraud action, which damages are measured based upon "the fair compromise value" of their released tort claims at the time of settlement. DuPont further contended that:

> Despite electing to forego their claims for the actual judgment value of their [product liability] claims—indeed, settling these claims, releasing these claims, and keeping DuPont's settlement money for these claims—[the] plaintiffs have not sought the fair compromise value of their [product liability] claims as of the day of their settlements.
>
> Rather, [the] plaintiffs in this case seek the *"actual judgment value"* of their RELEASED [product liability] cases as of today[, as demonstrated by the plaintiffs' statement of the appropriate measure of recovery in the first amended complaint].

(Emphases and capitalization in original.) DuPont argued that, inasmuch as

> *what* the compromise value factors are in a particular case, as well as *how* they would be evaluated in that case, are not matters within the common knowledge and experi-

ence of jurors[,] ... expert testimony by lawyers experienced in litigating and compromising cases is required to aid the jury in determining the fair compromise value of a case.

(Footnote omitted.) (Emphases in original.) Consequently, DuPont asserted that the plaintiffs did not have the expert testimony required to sustain their burden of proof on the proper measure of damages, stating that:

> [The plaintiffs' underlying product liability action] lawyers[, in their expert reports, as discussed *infra*, did] not opine about the *factors* relevant to the determination of *the fair compromise value* of *each* plaintiff's case on the date of the settlement, nor how those factors would be applied—to each case. They simply state, generally, that their respective clients' [product liability] cases would have been *stronger* had they had the "hidden evidence," and thus the settlement value of the cases would have been *higher*.

(Emphases in original.)

In their memorandum in opposition to DuPont's motion, filed February 17, 2005, the plaintiffs argued that their remedy should not be limited to the reasonable settlement value absent fraud. Rather, they argued the remedy should be measured by the plaintiffs' change in circumstances resulting from the fraudulent conduct, which, according to the plaintiffs, is "the value of the position that was foregone, plus any consequential costs incurred as a result of the misconduct." The plaintiffs contended that:

> If [the p]laintiffs in this case are limited by the [c]ourt solely to the recovery of the value of a "reasonable" settlement in 1994, DuPont receives the benefit of its fraud. Such a ruling would serve to encourage fraud in settlements. Allowing a fraud-feasor to first reduce the value of a plaintiff's settlement (or even judgment) by withholding evidence, but then, [if] fraud is discovered, limiting the remedy 1, 2, 3 (or, in this case, 11) years later to that amount the defendant might have paid towards settlement in the absence of that fraud, but no more, would reward the fraud-feasor, who would first have had the use of the unpaid portion of the unrecovered settle-

ment or judgment, and then protection from the court against imposition of any fuller remedy. If that were the law, every defendant in litigation would be motivated to first try fraud, and only later try to be "reasonable."

The plaintiffs maintained that

the duty of the jury will be to measure the entire value of [the p]laintiffs' loss resulting from the fraudulent induced settlements, which naturally includes consideration of the value of the settled [product liability] claims. It will be the jury's role to determine if the consideration paid in the original settlement is more or less than the loss.... In this case, only after the jury had first considered the *value of [the p]laintiffs' [product liability] claims* ("judgment value"), should the jury next consider what the value the jury believes was actually lost through fraud.

(Emphasis in original.) Lastly, the plaintiffs argued that their expert opinions fully satisfied the evidentiary requirements inasmuch as these opinions "repeatedly touch[ed] on the issues of factors related to liability, settlement, client recommendations, and the relation between liability, damages, settlement, and judgments in the product [liability] action[s]."

Following a hearing on the motion, the circuit court entered an order on February 28, 2005, granting DuPont's motion for summary judgment, concluding that,

as a matter of law, when a[p]laintiff claims to have been fraudulently induced to settle a tort claim because of discovery/litigation fraud, (s)he has two options[, i.e., two choices of remedies]: (1) to sue to rescind the settlement contract; or (2) to affirm the contract and sue for fraud. If (s)he chooses to sue for fraud, the remedy available to [the p]laintiff is the fair compromise value of the claim at the time of the settlement. In order to meet their burden of proving the fair compromise value at the time of settlement, [the p]laintiffs would need to meet this burden with expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each [p]laintiff's case. [The p]laintiffs have not submitted the expert testimony required to sustain their burden of proof on the proper measure of damages in their cases. The deadlines for [the p]laintiffs to submit their final expert reports and amend their pleadings were October 15, 2004, and December 14, 2004, respectively. This court previously made clear that expert reports were to be final and that the experts would not be allowed to testify on matters beyond their respective reports in its Order Related to Trial Procedures, filed May 6, 2004. [The p]laintiffs are therefore unable to prove the fact or amount of settlement fraud damages as a matter of law, and summary judgment is granted on all remaining claims herein.

(Emphasis added.) On August 10, 2005, the above order, *inter alia*, was certified, pursuant to HRCP Rule 54(b), as final judgment on all of the plaintiffs' claims. The plaintiffs filed their notice of appeal on September 6, 2005. DuPont's notice of cross-appeal was filed on September 19, 2005.

## II. STANDARD OF REVIEW

This court reviews the circuit court's grant of summary judgment *de novo*. *O'ahu Transit Servs., Inc. v. Northfield Ins. Co.*, 107 Hawai'i 231, 234, 112 P.3d 717, 720 (2005).

## III. DISCUSSION

### A. The Plaintiffs' Appeal

#### 1. The Order Granting Summary Judgment Based on the Plaintiffs' Inability to Prove Damages

As previously stated, the plaintiffs maintain that the circuit court erred in granting summary judgment based on their inability to prove damages. They argue that the circuit court incorrectly announced several conclusions relating to: (1) the choice of remedies; (2) the proper measure of damages; (3) the requirement of attorney expert testimony; and (4) the plaintiffs' failure to sustain their burden of proof. Each of the plaintiffs' contentions is addressed in turn.

### a. *the choice of remedies*

In its February 28, 2005 order, the circuit court expressly concluded that the plaintiffs have two available remedies—(1) to rescind the settlement agreements or (2) to affirm the agreements and sue for fraud. The plaintiffs raise, as a point of error, that the circuit court's conclusion was erroneous. They, however, provide no discernible argument or cite to any authority with respect to their position. This court has repeatedly announced that it is not obliged to address matters for which the appellants have failed to present discernible arguments. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) (2007) (the opening brief must exhibit "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities ... relied on"); *Taomae v. Lingle*, 108 Hawai'i 245, 257, 118 P.3d 1188, 1200 (2005) (stating that the court may disregard points of error when the appellant fails to present discernible arguments supporting those assignments of error); *Norton v. Admin. Dir. of the Court*, 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (same). Thus, on this basis alone, we could decline to address this matter. However, in light of the plaintiffs' next contention concerning the proper measure of damages in the instant fraud action, a preliminary question arises regarding the remedies afforded a defrauded plaintiff in Hawai'i.

This court has repeatedly announced that:

As a general rule, a properly executed settlement precludes future litigation for its parties. Indeed, a settlement agreement

is an agreement to terminate, by means of mutual concessions, a claim which is disputed in good faith or unliquidated. It is an amicable method of settling or resolving bona fide differences or uncertainties and is designed to prevent or put an end to litigation.

15A Am.Jur.2d *Compromise and Settlement* § 1 (1976). We acknowledge the well-settled rule that the law favors the resolution of controversies through compromise or settlement rather than by litigation. Such alternative to court litigation not only brings finality to the uncertainties of the parties, but is consistent with this court's policy to foster amicable, efficient, and inexpensive resolution of disputes. In turn, it is advantageous to judicial administration and thus to government and its citizens as a whole.

*Amantiad v. Odum*, 90 Hawai'i 152, 161–62, 977 P.2d 160, 169–70 (1999) (internal quotation marks and some citations omitted). We have further stated that settlement agreements (1) "are simply a species of contract," *Wong v. Cayetano*, 111 Hawai'i 462, 481, 143 P.3d 1, 20 (2006) (citations omitted), and, thus, (2) are governed by principles of contract law, *State Farm Fire & Cas. Co. v. Pac. Rent–All, Inc.*, 90 Hawai'i 315, 323–24, 978 P.2d 753, 761–62 (1999) (construing a settlement agreement under contract principles). Consequently, as with contracts, settlement agreements induced by either a fraudulent or material misrepresentation are voidable by the defrauded party because he or she has not freely bargained but has been induced to settle by the other party. *Cf. Fujimoto v. Au*, 95 Hawai'i 116, 157, 19 P.3d 699, 740 (2001) (stating the general rule that, "if a party's misrepresentation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient" (internal quotation marks, citations, and original brackets omitted)). In other words, a plaintiff who was induced to enter into a settlement agreement by fraudulent or material misrepresentations may "obtain a decree rescinding or cancelling the agreement *ab initio*." *Peine v. Murphy*, 46 Haw. 233, 239, 377 P.2d 708, 712 (1962) (citations omitted); *see also Hong v. Kong*, 5 Haw.App. 174, 181, 683 P.2d 833, 840 (1984) (stating that "[t]he rescission of a contract for fraud in the inducement is part of the law of restitution") (citations omitted). The result of rescission is to return both parties to the status quo ante, *i.e.*, each side is to be restored to the property and legal attributes that it enjoyed before the contract was entered and performed. As the United States Court of Ap-

peals for the Ninth Circuit (the Ninth Circuit) has stated:

> Rescission reverses the fraudulent transaction and returns the parties to the position they occupied prior to the fraud. It restores the status quo ante. Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus interest.

*Ambassador Hotel Co. v. Wei–Chuan Inv.,* 189 F.3d 1017, 1031 (9th Cir.1999) (citations omitted). Hawaiʻi courts are clearly in accord with the basic contract principle that a party defrauded on a contract may seek rescission of the contract. *See* Restatement (Second) of Contracts § 164 (1981) (a contract is voidable when it is entered into on the basis of a fraudulent or material misrepresentation).

■ However, whether plaintiffs who have released their tort claims may affirm a fraudulently induced settlement agreement and maintain a separate fraud action is less clear in Hawaiʻi. Although this court appears to recognize such a remedy, it has yet to explicitly declare so. *See, e.g., Lemle v. Breeden,* 51 Haw. 426, 436, 462 P.2d 470, 475 (1969) (holding that a lease is essentially a contractual relationship, and, upon a breach of an implied warranty of habitability, a tenant would be entitled to "basic contract remedies of damages, reformation, and rescission"). Nonetheless, rather than limit a party's remedy to rescission, we believe a defrauded party should be afforded the choice of remedies, *i.e.,* rescission or an independent action for damages. As this court has announced, because "[s]ettlement is the voluntary relinquishment of the right to a determination by a court of law[,]" "encouraging parties to forego the protections associated with a trial *requires adequate assurance that appropriate remedies exist for settlements reached through bad faith and misconduct.*" *Matsuura I,* 102 Hawaiʻi at 161, 73 P.3d at 699 (emphasis added).

In this regard, *DiSabatino v. United States Fidelity & Guaranty Co.,* 635 F.Supp. 350 (D.Del.1986), is instructive. In that case,

the United States District Court for the District of Delaware was presented with the issue whether, under Delaware law, "a plaintiff who has settled a negligence suit for personal injuries may affirm that release and institute a cause of action based on fraud." *Id.* at 351. Although acknowledging the lack of Delaware precedent on the issue, the court proceeded to analyze Delaware law based primarily on cases involving election of remedies under contract law. *Id.* Focusing on the earlier Delaware decisions of the Court of Chancery in *Hegarty v. American Commonwealths Power Corp.,* 163 A. 616 (Del.Ch. 1932), and *Eastern States Petroleum Co. v. Universal Oil Products Co.,* 49 A.2d 612 (Del.Ch.1946), the court concluded that the holdings in *Hegarty* and *Eastern States Petroleum* "can easily be extended to cover a contract of settlement compromising a tort claim." *DiSabatino,* 635 F.Supp. at 353. Consequently, the court held that the plaintiffs, who were defrauded on an agreement to settle a tort claim, may elect "either to rescind the contract or to affirm it and sue for damages resulting from the fraudulent misrepresentation[.]" *Id.* at 356.

In so holding, the court in *DiSabatino* observed that the minority of courts that have limited a defrauded plaintiff to the remedy of rescission have done so based on two grounds. First, by distinguishing between simple contracts and releases of tort actions, the minority of courts essentially reason that:

> There is usually no analogy between the situation of one induced by fraud to release a tort claim and one induced by fraud to buy something. Obviously, ... the releasor of a tort claim buys nothing, although he may receive something, usually money or its equivalent, for what he relinquishes. He does give up something (*i.e.,* his tort claim), as a seller gives up what he sells. Thus, on cursory consideration, the release of a tort claim might appear to be analogous to a sale of something. However, where there has been a sale of something, possession of that something has usually been relinquished by the seller. Even where use of the sold something has not made it less valuable, the seller will usually want money for it as he did when he made

the sale. If he takes it back, he has to sell it to get that money. Each change of possession of that something will ordinarily involve expense or inconvenience. On the other hand, *the releasor has nothing to repossess on rescission of the release; and such rescission revests him with the same claim for money that he had before, not something he must resell to get that money. In reality, the releasor does not sell anything even of an intangible nature. In effect, the releasor has merely agreed for a consideration not to enforce his tort claim.*

*Id.* at 353–54 (quoting *Shallenberger v. Motorists Mut. Ins. Co.*, 167 Ohio St. 494, 150 N.E.2d 295, 300 (1958)) (emphasis added). The *DiSabatino* court, however, disagreed with the aforementioned reasoning, stating that

[a] settlement agreement is surely a contract, for which consideration on both sides has passed. The consideration given by the plaintiff, the right to prosecute his tort claim—like something which a seller has sold and whose value in use is bound to decline—certainly will change in value with the passage of time. In effect, the plaintiff is a seller of a cause of action of which he must regain possession. Each change of possession of that something will ordinarily involve expense or inconvenience.

*DiSabatino*, 635 F.Supp. at 354 (internal quotation marks and citations omitted).

Second, the minority of courts assume that "the damages in the action for fraud are too speculative because they must be measured on the basis of the personal injuries sustained. 'The measure of damages, if any, in the action for fraud and deceit is inextricably bound with the question of liability and the nature and extent of the injuries involved in the underlying tort claim which was settled.'" *Id.* (quoting *Mackley v. Allstate Ins. Co.*, 564 S.W.2d 634, 636 (Mo.Ct.App.1978)) (original brackets omitted). However, as discussed *infra* in section III.A.1.b., the *DiSabatino* court rejected such reasoning and concluded that damages for fraud are con-

ceptually different from damages for the underlying tort claims and are not too speculative to calculate. *Id.* at 354–55. The court also observed that a defrauded party may be entitled to punitive damages that would not be available if the original action was reinstated through rescission. *Id.* at 356. Finally, the court believed that,

as a matter of policy, this cause of action should be deemed to exist[ ] ... [because an unscrupulous party] would have everything to gain and nothing to lose by systemically defrauding tort claimants into accepting low settlement offers. In such cases[, the defendant] gambles that the deceit will not be uncovered. If the fraud is uncovered, then the [defendant] only faces litigation, or the costs of reimbursement, that it would have had to confront without a settlement.

*Id.* at 355.

The interpretation of Delaware law in *DiSabatino* was later confirmed in *E.I. DuPont de Nemours and Co. v. Florida Evergreen Foliage*, 744 A.2d 457 (Del.1999). In that case, the Delaware Supreme Court concluded that "*DiSabatino*, both in its analysis of previous Delaware decisional law and its statement of the policy concerns supporting the recognition of a damages option, is a correct foreshadowing of Delaware law." *Id.* at 464. The court followed *DiSabatino* and held that "a party alleging fraud in the settlement of a tort claim may elect rescission and restoration to the *status quo ante* or, alternatively, may bring an action for the recovery of special, or expectancy, damages with retention of the settlement proceeds." *Id.* at 465 (footnote omitted); *see also Matsuura v. Alston & Bird*, 166 F.3d 1006, 1008 & n. 4 (9th Cir.1999) (finding *DiSabatino's* analysis persuasive and rejecting the reasonings behind other courts that restricted a defrauded plaintiff's remedies to rescission). Indeed, the majority of jurisdictions that have considered the issue have also favored affording plaintiffs the choice of either of the two remedies.[7] The weight of authority, there-

---

7. *See, e.g., Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir.1994) (applying New York law); *Authentic Architectural Millworks, Inc. v. SCM Group USA, Inc.*, 262 Ga.App. 826, 586 S.E.2d 726, 728

(2003); *Richardson v. Econ. Fire & Cas. Co.*, 109 Ill.2d 41, 92 Ill.Dec. 516, 485 N.E.2d 327, 330 (1985) (citing a collection of cases from Indiana, Michigan and New York); *Siegel v. Williams*, 818

fore, supports the conclusion of the circuit court in the instant case to allow defrauded tort plaintiffs the traditional contract remedies of either (1) rescinding the contract, returning any benefits received, and being returned to the status quo or (2) affirming the contract, retaining the benefits, and seeking damages.

▮▮▮▮ Additionally, when there exists two or more concurrent but inconsistent remedies, as here, the equitable doctrine of election of remedies provides that:

> [A] plaintiff need not elect, and cannot be compelled to elect between inconsistent remedies during the course of trial. If, however, a plaintiff has *unequivocally and knowledgeably* elected to proceed on one of the remedies he or she is pursuing, he or she may be barred recourse to the other. The doctrine acts as a bar precluding a plaintiff from seeking an inconsistent remedy as a result of his or her previous conduct or election.

*Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 71, 905 P.2d 29, 46 (1995) (internal quotation marks, citations, brackets, and ellipses omitted) (emphasis in original). The purpose of the election of remedies doctrine "is not to prevent recourse to any remedy, or to alternative remedies, but to prevent double recoveries or redress for a single wrong." 25 Am.Jur.2d *Election of Remedies* § 3 at 665 (2004) (footnotes omitted).

In the instant case, the plaintiffs did not seek rescission of their settlement agreements in their first amended complaint. In fact, the complaint wholly rested upon allegations of DuPont's fraudulent misrepresentations and concealment of scientific data and information that were allegedly vital to the plaintiffs' settlement negotiations of their product liability claims. Thus, based on the allegations of their complaint, the plaintiffs have "unequivocally and knowledgeably" elected to affirm their settlement agreements and pursue an action for fraud. Consequently, we next examine the appropriate measure of damages in the plaintiffs' asserted fraud action.

b. *the proper measure of damages*

The circuit court concluded that, when a defrauded party elects to affirm the settlement agreement and sue for fraud, "the remedy available [ (*i.e.*, damages) ] . . . is *the fair compromise value of the claim at the time of the settlement.*" (Emphasis added.) The plaintiffs, however, argue that the circuit court erroneously "limit[ed] the amount of recoverable damages to the difference between what [they] actually settled for, and what they could have settled for, had there been no fraud." Such limitation, according to the plaintiffs, "has never been accepted in this jurisdiction. To the contrary, the Hawai'i [a]ppellate [c]ourts have continually held that the desired remedy in fraud cases is to restore the victim to the position he would have occupied but for the misrepresentation." (Citations omitted.) The plaintiffs, thus, believe that the circuit court's ruling

> deviated from the goal of the available remedy—to restore them to the former positions they occupied but for DuPont's deceit—and instead served to deprive [the p]laintiffs of any possibility of recovering that which, in all likelihood, they could reasonably have achieved had the fraudulent conduct not occurred. The decision was contrary to the established law of Hawai'i, and contrary to the proper outcome dictated by the facts of the litigation, and should now be set aside.

DuPont, on the other hand, maintains that the "fair compromise value is the proper measure of damages for *full and adequate* compensation of a fraudulent inducement claim, and is not a cap or limit on damages." (Emphasis in original.) (Internal quotation marks and other emphases omitted.) In DuPont's view,

> [t]his measure of damages is consistent with the general objective of fraud, which is to place the defrauded plaintiff in the

N.E.2d 510, 514 (Ind.Ct.App.2004); *Ware v. State Farm Mut. Auto. Ins. Co.*, 181 Kan. 291, 311 P.2d 316, 320–21 (1957); *Bilotti v. Accurate Forming Corp.*, 39 N.J. 184, 188 A.2d 24, 30–35 (1963); *Mehovic v. Mehovic*, 133 N.C.App. 131, 514

S.E.2d 730, 733 (1999); *Sabbatis v. Burkey*, 166 Ohio App.3d 739, 853 N.E.2d 329, 332 (2006); *Fields v. Yarborough Ford, Inc.*, 307 S.C. 207, 414 S.E.2d 164, 166 (1992).

position he would have been "but for" the fraud. Since [the plaintiffs] claim their settlement amounts were less than they were worth because DuPont had induced them to settle through certain fraudulent misrepresentations, their measure of damages logically is what their settlement amount would have been if there had been no fraud.

 It is well-settled that all tort claims require that damages be proven with reasonable certainty. *See, e.g., Weinberg v. Mauch,* 78 Hawai'i 40, 50, 890 P.2d 277, 287 (1995) ("[I]t is of the essence in an action ... that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses." (Internal quotation marks and citation omitted.)); *see also Roxas v. Marcos,* 89 Hawai'i 91, 141 n. 33, 969 P.2d 1209, 1259 n. 33 (citing a collection of cases for the same proposition). Specifically, in a fraud case, "the plaintiff must have suffered substantial actual damage, not nominal or speculative." *Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 320, 47 P.3d 1222, 1233 (2002) (citation and emphasis omitted). The "plaintiffs suing in fraud are required to show both that they suffered actual pecuniary loss and that such damages are definite and ascertainable, rather than speculative." *Id.; see also Hawai'i's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) ("plaintiff must show that he [or she] suffered substantial pecuniary damage"). The aim of compensation "is to put the plaintiff in the position he or she would have been had he or she not been defrauded." *Zanakis–Pico,* 98 Hawai'i at 320, 47 P.3d at 1233 (quoting *Ellis v. Crockett,* 51 Haw. 45, 52–53, 451 P.2d 814, 820 (1969)) (original brackets and ellipsis omitted).

 This court has further explained that:

A distinction is made in the law between the amount of proof required to establish the fact that the injured party has sustained some damage and the measure of proof necessary to enable the jury to determine the amount of damage. *It is now generally held that the uncertainty which prevents a recovery is uncertainty as to the fact of damage and not as to its amount. However, the rule that uncertainty as to the amount does not necessarily prevent recovery is not to be interpreted as requiring no proof of the amount of damage. The extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing or conclusion founded upon mere speculation or guess.*

*Chung v. Kaonohi Ctr. Co.,* 62 Haw. 594, 605, 618 P.2d 283, 290–91 (1980) (emphasis added) (citation and brackets omitted) (format altered), *abrogated on other grounds by Francis v. Lee Enters., Inc.,* 89 Hawai'i 234, 971 P.2d 707 (1999). In other words, where the fact of damage is established, this court will not insist upon a higher degree of certainty as to the amount of damages than the nature of the case permits, particularly where the uncertainty was caused by the defendant's own wrongful acts. *Coney v. Lihue Plantation Co.,* 39 Haw. 129, 138 (1951). This court, however, has recognized that

[t]he problem of how to measure damages, and how to establish them in fraud cases, is always a difficult one since the person defrauded has, because of the fraud, not pursued alternative courses of action, and the results of those untaken courses therefore remain speculative. In 3 Restatement (Second) of Torts (1977), a discussion of the problem of damages proof appears under § 549. [8] In the Comment to subsec-

---

8. Section 549, entitled "Measure of Damages for Fraudulent Misrepresentation," provides that:

 (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including

 (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

 (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

tion (2) of that section, the following appears:

> When the plaintiff has made a bargain with the defendant, however, situations arise in which the rules stated in Subsection (1), and particularly that stated in Clause (a) of that Subsection, do not afford compensation that is just and satisfactory. . . .
>
> The frequency of these situations has led the great majority of the American courts to adopt *a broad general rule giving the plaintiff,* in an action [for] deceit, *the benefit of his bargain with the defendant in all cases,* and making that the normal measure of recovery in actions of deceit.

*Leibert v. Fin. Factors, Ltd.,* 71 Haw. 285, 290–91, 788 P.2d 833, 837 (1990) (emphases added); *see also Zanakis–Pico,* 98 Hawai'i at 320, 47 P.3d at 1233 ("In fraud or deceit cases, the measure of pecuniary damages is usually confined to either the 'out-of-pocket' loss or the 'benefit of the bargain[.]' " (Citation and ellipses omitted.)).

Notwithstanding the aforementioned well-established general principles regarding the proof of damages, this court has not had the occasion to articulate what must be proven in order to bring a meritorious settlement fraud claim. To this end, *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* 431 F.3d 353 (9th Cir.2005), *cert. denied,* 547 U.S. 1192, 126 S.Ct. 2861, 165 L.Ed.2d 895 (2006), is instructive. In that case, the Ninth Circuit reversed the federal district court's ruling in *Matsuura v. E.I. du Pont de Nemours & Co.,* 330 F.Supp.2d 1101 (D.Haw.2004) [hereinafter, *Matsuura II* ]. Relying upon *Urtz v. New York Central & Hudson River Railroad Co.,* 202 N.Y. 170, 95 N.E. 711 (1911), and *Automobile Underwriters, Inc. v. Rich,* 222 Ind. 384, 53 N.E.2d 775 (1944), the federal district court in *Matsuura II* had determined that "a 'settlement fraud' plaintiff must prove not only that the settled claim had merit, but also that the value of the claim exceeded the amount of the fraudulently-induced settlement." 330 F.Supp.2d at 1123. Applying this rule to the facts of that case, the federal district court concluded that "DuPont [wa]s entitled to summary judgment on all of the

*Matsuura* [p]laintiffs' claims due to their inability to prove either the fact or [the] amount of damages with reasonable certainty." *Id.* at 1125.

In *Urtz,* the New York Court of Appeals determined that, where the underlying claim has no viability, there is no potential for recovery for fraud in the inducement of settlement because plaintiff would not be able to show any injury by reason of abandonment of an entirely valueless claim. 95 N.E. at 713. In *Urtz,* the plaintiff, relying on alleged misrepresentations, settled her claims for the wrongful death of her husband. *Id.* at 712. The jury found in favor of the plaintiff in her fraud action but the appellate court reversed based upon the trial court's refusal to charge the jury that, in order to maintain the action, the plaintiff must demonstrate that her original claim for wrongful death was valid and existing at the time of settlement. *Id.* at 714. The court offered the following example of a plaintiff claiming that she was fraudulently induced to settle a claim based on a promissory note and stated:

> [S]he, in an action to recover her damages caused by the fraud[,] must have given evidence in proof of the validity of the note to afford the jury a starting point for the measurement of her damages, and, if they found that the note was forged and not made by [the] defendant, they would find also that she had sustained no damage and could not maintain the action. Unless she had the valid note of the defendant, she had and released in the compromise nothing of value.

*Id.* at 712. By ascribing error to the jury instructions, the *Urtz* court essentially specified that, in the trial of a fraudulently induced settlement claim, the plaintiff carries the burden of proving some merit to the underlying cause of action. Likewise, in *Automobile Underwriters,* the Indiana Supreme Court indicated that, when the plaintiff elects to proceed with the fraud action, he or she

> recognizes that the settlement is a bar to the original action and that *it is incumbent on him to allege and prove* not only that the settlement was procured by fraud and to his damage, but also *that he had a good*

*cause of action against the original tort feasor at the time of the settlement.*

53 N.E.2d at 777 (emphases added). In *Living Designs,* the Ninth Circuit implicitly expressed its disapproval of *Urtz* and *Automobile Underwriters* to the extent that these cases required a plaintiff in an action based on settlement fraud to prove that he or she had a "good" cause of action against the tortfeasor at the time of settlement. The Ninth Circuit reasoned that, to conclude that

> plaintiffs must demonstrate that their settled claim had merit is inconsistent with the aim of compensation in fraud cases, which is to restore plaintiffs to the position they would be in absent the fraud and to provide plaintiffs with the benefit of the bargain, *see Leibert,* [71 Haw. at 288–90,] 788 P.2d at 836–37, particularly as a party's decision to settle is often made as a result of a cost-benefit analysis rather than an assessment of the claim's merits.

431 F.3d at 367. Rather, the Ninth Circuit, relying upon *DiSabatino,* held that

> the relative strength of the claim in the absence of fraud should be used by the trier of fact to determine the amount of the defrauded party's damages. Whether the defrauded party could have won its case if it proceeded to trial is irrelevant to this calculation. *The critical consideration is the settlement value of the case on the date settlement was reached.* Such a determination is not beyond the power of a jury to determine. The use of probability analysis, for example, in calculating settlement value is not uncommon.

431 F.3d at 368 (emphasis added).[9]

As stated above, *DiSabatino* dealt with the question whether the plaintiff was permitted to affirm the settlement agreement and institute an independent cause of action based on fraud, to which the court answered affirmatively. 635 F.Supp. at 351. In declining to follow other courts' limitation of remedies to rescission based, *inter alia,* on the assump-

tion that damages are too speculative, the court explained that:

> In any action based on fraud, the fact finder will simply measure the extent of the plaintiff's damages by examining what the agreement would have been, had the parties known the actual material facts. The nature of the injuries in the foregone tort action are relevant only to the extent of how they would affect the value of the claim to be compromised[.]

*Id.* at 355. The court further indicated that:

> Whether a good cause of action existed at the time of the settlement was a material fact that the parties already considered in reaching a settlement. Requiring a plaintiff to prove in a court of law the existence of a good cause of action for a tort would be inconsistent with affirmance of a settlement agreement. *Evidence of the legal and factual strength of the claim merely goes to the value of the claim that was compromised in determining damages from the fraud.*

*Id.* (citation omitted) (emphasis added). According to the *DiSabatino* court, the better approach is for the trier of fact to determine "the probable amount of settlement in the absence of fraud after considering all known or foreseeable facts and circumstances affecting the value of the claim on the date of settlement[;] the amount in settlement already received should [then] be deducted from this total amount." *Id.* at 355 (citation omitted). Stated differently, the defrauded plaintiff may "recover such an amount as will make the settlement an honest one." *Id.* (internal quotation marks and citation omitted). "[T]he measure of damages[, therefore,] is the loss of the bargain." *Id.* (citation omitted).

Moreover, although the Ninth Circuit rejected the holdings in *Urtz* and *Automobile Underwriters* that a defrauded plaintiff must prove that his or her settled claims had merit, the analyses of both courts as to the

---

9. Based on evidence indicating that knowledge of the withheld evidence would have substantially increased the settlement value of the cases, including evidence of comparable settlements of larger amounts and expert testimony, the Ninth Circuit ruled that there was a genuine issue of fact as to whether the plaintiffs could prove damages. *Id.* at 368. In so ruling, the court noted that such damages were "not so speculative that damages are incapable of calculation." *Id.* at 369.

method of determining damages are in accord with *Living Designs* and *DiSabatino.* Specifically, the *Urtz* court explained that the measure of damages is

> how much could the plaintiff have reasonably demanded and the defendant reasonably have allowed as [a] final compromise above and beyond the [amount] in fact allowed and received? ... [In determining the amount, the jury] would take into view the probabilities of the successful enforcement of the cause of action, the probable extent and expense of the expected litigation over this disputed claim, the law's delays, the probability of the continuing solvency of the defendant, and such other facts pertinent to the question of damages as the evidence presented.

95 N.E. at 713. Stated differently, the court believed that "the plaintiff, affirming the compromise agreement and unable to recover the contract balance, is entitled in accordance with the general rule to have such compromise agreement made as good for him as it reasonably and fairly would have been if only the truth had been told instead of a falsehood asserted." *Id.* at 714 (internal quotation marks omitted).

The *Automobile Underwriters* court expressed that the measure of damages in a fraud action "must take into consideration the salable value of the right of action for the purpose of compromising, and the nature and extent of the injuries known and foreseeable as of the time of the settlement, under the particular circumstances of the parties then shown existing." 53 N.E.2d at 777 (citations omitted). The proper procedure for determining damages, in the court's view, was for the jury to calculate the "probable amount" the parties would have agreed upon absent the fraud, taking into account "all of the known or foreseeable facts and circumstances which in any way affected the value of the claim on the date of settlement[.]" *Id.* at 779. The amount received by the releasor in exchange for signing the release is then deducted, and the balance constitutes the "true measure of the damage suffered" inasmuch as "[t]he ultimate fact to be ascertained is the actual damage caused by the fraudulent representations and not the dam-

age for the original injury." *Id.; see also Slotkin v. Citizens Cas. Co. of New York,* 614 F.2d 301, 312–13 (2d Cir.1979), *cert. denied,* 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980) (holding that, under New York law, the plaintiffs could recover as damages the "fair settlement value" less the sum they had received under the settlement; the true measure of damages was "the difference in settlement value before and after discovery of the fraud"); *Dilley v. Farmers Ins. Group,* 250 Or. 207, 441 P.2d 594, 595 (1968) ("if fraud had been committed, the measure of damages was the difference between the amount plaintiff received in settlement and that she would have received by way of settlement had the alleged false representations not been made"); *Rochester Bridge Co. v. McNeill,* 188 Ind. 432, 122 N.E. 662, 665 (1919) (same).

The plaintiffs, however, urge this court not to follow the aforementioned measurement of damages enunciated by the Ninth Circuit and other jurisdictions because such "limited" remedy (1) is "contrary to several significant policy concerns" expressed by this court in *Matsuura I* and (2) "clearly deviated from the goal of the available remedy—to restore them to their former positions they occupied but for DuPont's deceit." The plaintiffs' contentions are without merit.

In support of their position that the limited remedy imposed by the circuit court is contrary to policy concerns, the plaintiffs rely upon this court's pronouncement in *Matsuura I* that limiting liability for fraud is unfavored in light of the policy of encouraging settlements. 102 Hawai'i at 155–62, 73 P.3d at 693–700. Specifically, the *Matsuura I* court was presented with the certified question whether, under Hawai'i law, a party is "immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings[.]" *Id.* at 154, 73 P.3d at 692. In answering negatively to the inquiry, we examined several policies underlying the litigation privilege, such as those promoting the candid, objective, and undistorted disclosure of evidence, avoiding the chilling effect resulting from the threat of subsequent litigation, encouraging settle-

ment, and discouraging abusive litigation practices. *Id.* We essentially determined that the policies associated with the litigation privilege doctrine do not favor limiting liability in a subsequent proceeding where there is an allegation of fraud committed in the prior proceeding. *Id.* at 155–62, 73 P.3d at 693–700. We, therefore, concluded that, "[u]nder Hawai'i law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings." *Id.* at 162, 73 P.3d at 700. The plaintiffs' reliance upon the *Matsuura I's* policy reasonings, however, is misplaced. The court in *Matsuura I* was not confronted with the issue concerning the method of measuring damages, but only whether a fraud action based on a party's conduct in prior litigation proceedings exists in the first instance.

Furthermore, the plaintiffs' argument that the limitation of their damages to the settlement differential is essentially contrary to the well-settled aim of compensation in deceit cases, *i.e.,* "to put the plaintiff in the position he or she would have been had he or she not been defrauded[,]" *Zanakis–Pico,* 98 Hawai'i at 320, 47 P.3d at 1233 (citation and original brackets omitted), is unavailing. The plaintiffs argue that the appropriate remedy is to allow "the parties to determine what damages they claim and seek to prove under the particular circumstances of the claim." In other words, the plaintiffs appear to assert that the proper measurement of their damages, if the jury so determined, could be the "actual judgment value" of their product liability claims (less the amount they received pursuant to the settlement agreements).

In support of their position, the plaintiffs cite to *Farm Bureau Mutual Insurance Co. of Indiana v. Seal,* 134 Ind.App. 269, 179 N.E.2d 760 (1962), *Siegel v. Williams,* 818 N.E.2d 510 (Ind.Ct.App.2004), and *Edrei v. Copenhagen Handelsbank A/S,* No. 90 Civ. 1860(CSH), 1992 WL 322027 (S.D.N.Y. Oct.29, 1992) (unreported). The plaintiffs partially quote from *Farm Bureau Mutual Insurance* that the proper evidence of damages involves "the nature and extent of the injuries known and foreseeable [sic] a[t] the time of the settlement, under the particular

circumstances of the parties then shown existing." 179 N.E.2d at 764. The full quote, however, actually makes clear that the "nature and extent of injuries" are pertinent only for measuring the "compromise" value of the claim:

> [T]he measure of damages must *take into consideration* the salable value of the right of action *for the purpose of compromising,* and the nature and extent of the injuries known and forseeable [sic] a[t] the time of the settlement, under the particular circumstances of the parties then shown existing.

*Id.* (emphases added). In fact, *Farm Bureau Mutual Insurance,* an Indiana appellate case, follows its supreme court's *Automobile Underwriters* case, which held that, when a plaintiff affirms the settlement agreement, his damages are the "probable amount" the parties would have agreed upon absent the fraud, taking into account "all of the known or foreseeable facts and circumstances which in any way affected the value of the claim on the date of settlement[.]" *Automobile Underwriters,* 53 N.E.2d at 779.

Similarly, the plaintiffs rely upon *Siegel* to demonstrate that the parties in that case proffered an estimation of the potential jury verdict in the underlying claim as evidence of damages. 818 N.E.2d at 513–14. The *Siegel* court, however, was not presented with the issue as to what would be the proper measure of damages. Rather, the issues before the court concerned the sufficiency of the evidence to support a finding of fraud and the weight of expert testimony. *Id.* at 515–17. However, *Siegel* is another Indiana appellate court case and, thus, followed *Automobile Underwriters* in allowing the plaintiff to recover the "probable" settlement amount, absent fraud.

The plaintiffs' reliance on *Edrei* for the proposition that "[t]he case law is clear that[,] when a party is defrauded into releasing a claim against another party, the proper measure of damages is the value of the foregone claim," 1992 WL 322027, at *4, is also misplaced. The *Edrei* court, in explaining what the "value of the foregone claim" means, quoted *Slotkin* for the proposition that the "true measure of damages was the

difference between the *settlement value* before and after the discovery of the fraud[.]" *Id.* (emphasis added) (citation omitted). Accordingly, the plaintiffs have failed to provide any authority that would convince us that the proper measure of damages should be, as they contend, extended to the actual judgment value of their product liability claims.[10]

Indeed, as previously indicated, the plaintiffs had made an unequivocal and knowledgeable election of remedies to affirm the settlement agreements and pursue an action for fraud. However, the plaintiffs apparently sought to recover damages based upon what they would have been able to recover in their product liability suits against DuPont.[11] They cannot have it both ways, *i.e.*, affirm an agreement not to sue for such product liability injuries and yet recover damages for those injuries. In other words, they cannot accept the settlement money, sign a release, affirm the release, keep the money, and then sue for the *same* damages. As DuPont asserts, the plaintiffs "are seeking the *rescission* remedy

that, by their election to affirm their settlement contracts and sue … for fraud, is not available to them." (Emphasis in original.) *See Morse/Diesel, Inc. v. Fid. & Deposit Co. of Maryland,* 768 F.Supp. 115, 117 (S.D.N.Y. 1991) (stating the rule that a plaintiff cannot elect to pursue damages for fraud *and* rescission because "an award of damages for fraud affirms the contract" while "[r]escission vitiates the contract and places the parties in status quo prior to the transaction") (citation omitted); *Davis v. Hargett,* 244 N.C. 157, 92 S.E.2d 782, 786 (1956) (holding that the plaintiff could not affirm the release and recover the difference between the value of his original claim and what he received in settlement).

■ Here, the plaintiffs had foregone seeking the actual judgment value of their product liability claims via rescission of the settlement agreements and instead elected to affirm the agreements and seek damages in a fraud action, and, thus, their election precludes them from seeking damages for the

---

10. The plaintiffs also cite to a number of cases that merely stand for the general proposition that defrauded plaintiffs are entitled to adequate compensation or that the measure of damages is whatever losses were legally caused by the fraud or misrepresentation. For example, they cite to and provide parentheticals for the following cases:

 *McLean v. Charles Ellis Realty, Inc.,* [189 Or. App. 417,] 76 P.3d 661 (Or.Ct.App.2003) (plaintiffs entitled to all damages as "naturally, and proximately" result from the fraud); *Watts v. Krebbs[Krebs],* [131 Idaho 616,] 962 P.2d 387, 392 (Idaho 1998) ("[T]he victim of fraud is entitled to compensation for every wrong which is the natural and proximate result of the fraud. The measure of damages which should be adopted under the facts of a case is the one which will effect such result."); … *Kessel v. Leavitt,* [204 W.Va. 95,] 511 S.E.2d 720, 812 (W.Va.1998) ("it is axiomatic that the plaintiff's measure of damages in a cause of action for fraud would be any injury incurred as a result of the defendant's fraudulent conduct.")[.]

 These general principles lend no support to the plaintiffs' aforementioned argument.

11. During the circuit court proceedings, the plaintiffs' discovery responses confirmed that they were claiming the total product liability damage. For example, in their June 4, 2003 answers to interrogatories, the plaintiffs explained that the "actual *judgment* value" "refers to the amount of compensatory and punitive damages which could have been recovered by

[the p]laintiffs at trial of [their product liability cases], but for the fraudulent settlement." In their June 10, 2003 answers to interrogatories, the plaintiffs, in response to the inquiry as to how the "actual *settlement* value" was determined and what factors were considered in reaching the value, stated:

 Please note that "actual settlement value" of the underlying [product liability] case does not represent a statement of damages for this "litigation fraud" action, as the current claims seek recovery of the losses caused by [DuPont's] fraudulent conduct, which include but are not limited to the unrecovered value of the product claim[.]

 Indeed, in their opening brief, the plaintiffs indicated that "their claims were not confined to the 'actual settlement value' [DuPont might have paid had it not acted fraudulently]." The plaintiffs further state that DuPont

 was well advised through discovery, and through [the first amended] complaint, of the nature of damages [the p]laintiffs claim. [The plaintiffs'] fraud count states the damages claimed are the "monetary injuries" caused by DuPont's fraud. The fraudulent misrepresentation, negligent misrepresentation and nondisclosure claims more specifically seek damages "equal to the difference between the actual settlement or judgment value of their [product liability] claims and the actual value, if any, received for such claims."

 (Citations to the first amended complaint omitted.)

injuries sustained in the product liability actions. To conclude as the plaintiffs would have it would constitute an impermissible double recovery. If this court were to permit the plaintiffs to retain the benefits of the settlement agreements while seeking to recover the actual judgment value of their product liability claims, the plaintiffs would be in a better position than they would have been had the settlement negotiations been conducted in good faith. Such a result would be inconsistent with the aim of compensation in deceit cases, *i.e.,* "to put the plaintiff in the position he would have been had he not been defrauded." *Ellis,* 51 Haw. at 52, 451 P.2d at 820 (citation omitted).

Accordingly, we believe that the method enunciated by the *DiSabatino* court and followed by the Ninth Circuit in *Living Designs* is persuasive—namely, that the trier of fact determines "the probable amount of settlement in the absence of fraud after considering all known or foreseeable facts and circumstances affecting the value of the claim on the date of settlement[.]" *DiSabatino,* 635 F.Supp. at 355 (citation omitted). Stated differently, "[t]he critical consideration is the settlement value of the case on the date settlement was reached." *Living Designs,* 431 F.3d at 368. Consequently, we hold that the circuit court did not err in concluding that the measure of damages for the plaintiffs' fraud action is "the fair compromise value of the claim at the time of the settlement."

Inasmuch as the plaintiffs submitted evidence in opposition to DuPont's motion, we examine whether the circuit court properly determined that the evidence was insufficient, as a matter of law, to establish the plaintiffs' damages. Preliminarily, however, we must first determine whether, in proving damages, *i.e.,* the fair compromise value of the claim at the time of the settlement, attorney expert testimony was necessary in the first instance.

c. *the requirement of attorney expert testimony*

Liability for fraud, as for other torts, requires proof of duty, breach of duty, causation, and damages. *Hong,* 5 Haw.App. at

181, 683 P.2d at 840 ("[f]raud is a common-law tort"); *Von Holt v. Izumo Taisha Kyo Mission of Hawaii,* 42 Haw. 671, 722 (1958) ("Fraud in its generic sense, especially as the word is used in courts of equity, comprises all acts, omissions[,] and concealments involving a breach of legal or equitable duty and resulting in damage to another." (Internal quotation marks and citation omitted .)), *overruled on other grounds by State v. Pauline,* 100 Hawai'i 356, 60 P.3d 306 (2002). Specifically, to establish a fraud claim based on a failure to disclose a material fact,

> there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but *reasonably* believed true by the other party, and (4) *upon which the other party relies and acts to his or her damage.*

*Matsuura I,* 102 Hawai'i at 162–63, 73 P.3d at 700–01 (citations and internal brackets omitted) (emphases added). However, DuPont's motion for summary judgment was premised solely on the element of damages, *i.e.,* the plaintiffs' inability to prove damages. In light of the circuit court's ruling, it must be assumed that the parties and the court presumed, for purposes of summary judgment, that DuPont breached its duty by disclosing certain material scientific data and information that it knew to be false, on which the plaintiffs reasonably relied and acted upon to their detriment. Thus, the inquiry on appeal is whether the plaintiffs have supplied the evidentiary showing of damages necessary to defeat summary judgment.

According to the circuit court, to carry their burden of proving damages, *i.e.,* "the fair compromise value" of the product liability claims at the time of settlement, the plaintiffs "would need ... expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each [p]laintiff's case." The plaintiffs, however, argue that:

> It has never been the law in the State of Hawai'i that expert evidence is a mandatory element of a claimant's case. Nor has it ever been required that such experts be of a particular occupation or persuasion; it is only necessary that they be appropriately

"qualified" to render an opinion which assists the trier of fact in its deliberations. The [c]ircuit [c]ourt's ruling violated both of these established tenets.

(Emphasis omitted.)

In retort, DuPont contends that

> determining the fair compromise value of a complex products liability case, taking into consideration all the facts and circumstances of a particular case at a particular point in time, is a complicated undertaking and something clearly beyond the ability of a lay jury. Obviously, a jury should not speculate in an area where it could not be expected to have sufficient knowledge or experience. And without proper expert testimony, a jury would be speculating because a jury simply does not have the knowledge or experience to determine the fair compromise value of a complex, products liability action.

> The reason why expert testimony is required is because, unlike special and general damages in a typical tort action, fair compromise value is not based upon the judgment of a reasonably prudent person, but the judgment of a reasonably prudent *attorney*. Clearly, what a reasonable, knowledgeable and prudent attorney would do in a complex products liability case is beyond the experience of a lay jury.

(Emphasis in original.)

■■■ Hawai'i Rules of Evidence (HRE) Rule 702 (1993) provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

Moreover, this court has declared that:

> Where the subject matter is technical, scientific or medical and not of common observation or knowledge, expert testimony is allowed into evidence. Such testimo-

ny is to aid the jury in the determination of the issues involved and to provide a sufficient basis for the conclusion to be drawn by the jury rather than by conjecture and speculation. Expert testimony is not conclusive and like any testimony, the jury may accept or reject it.

*Bachran v. Morishige*, 52 Haw. 61, 67, 469 P.2d 808, 812 (1970) (citations omitted); *see also State v. Batangan*, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990) ("Expert testimony assists the trier of fact by providing a resource for ascertaining truth in relevant areas outside the ken of ordinary laity. Specialized knowledge which is the proper subject of expert testimony is knowledge not possessed by the average trier of fact who lacks the expert's skill, experience, training, or education." (Internal quotation marks and citations omitted.)).

It is well-settled that, in medical malpractice cases, which have been generally predicated on the negligent failure of a physician or surgeon to exercise the requisite degree of skill and care in treating or operating on a patient,

> the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony. The standard of care to which a doctor has failed to adhere must be established by expert testimony because a jury generally lacks the requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert.

*Craft v. Peebles*, 78 Hawai'i 287, 298, 893 P.2d 138, 149 (1995) (citations and internal quotation marks omitted). As this court has stated,

> [i]n the ordinary negligence case[,] the jury can determine whether there has been a breach of defendant's duty to the plaintiff on the basis of their everyday experience, observations[,] and judgment. The ordinary negligence case will not require expert opinion evidence to delineate acceptable from unacceptable standards of care. However, in the medical negligence case, lay jurors are ill prepared to evaluate

complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient. Therefore, expert opinion evidence is generally required to aid the jury in its tasks.

*Bernard v. Char,* 79 Hawaiʻi 371, 377, 903 P.2d 676, 682 (App.1995) (citations, brackets, and emphasis omitted); *see also Carr v. Strode,* 79 Hawaiʻi 475, 486, 904 P.2d 489, 500 (1995) (in an informed consent claim, expert medical testimony is required to establish the materiality of the risk of harm that in fact occurs); *Phillips v. Queen's Med. Ctr.,* 1 Haw.App. 17, 18, 613 P.2d 365, 366 (1980) (in a case for wrongful death of the plaintiff's wife, expert medical testimony as to the cause of death was necessary to sustain case against defendant hospital and physicians). Clearly, a jury of lay persons generally lacks the knowledge to determine the factual issues of medical causation, the degree of skill, knowledge, and experience required of the physician, and the breach of the medical standard of care.

 Unlike medical malpractice cases, cases involving actions against attorneys "have rarely involved questions of the necessity and admissibility of expert testimony, probably because in such cases the court itself sits as an expert on the subject." *Collins v. Greenstein,* 61 Haw. 26, 39 n. 8, 595 P.2d 275, 283 n. 8 (1979) (citation omitted). This court, however, recognized that:

> More attention will probably be given in the future to the need for expert evidence. In many types of situations such as letting the statute of limitations run before a suit is filed, no testimony of lawyer is needed. *When the problem is one of interpretation of law, there is more likely to be a resort to expert evidence to explain the matter to the jury.*

*Id.* 40 n. 9, 595 P.2d at 283 n. 9 (emphasis added). Although this case does not involve an attorney malpractice suit, the stated principle in *Collins* that an issue concerning the interpretation of law requires expert assistance is applicable here. In our view, the determination of the fair value of what the plaintiffs would have received had there been no fraudulent conduct at the time of settlement entails guidance from legal experts.

 Indeed, parties settle to avoid a trial on the merits because of the uncertainty of the outcome and the high costs of litigation. *Gossinger v. Ass'n of Apartment Owners of Regency of Ala Wai,* 73 Haw. 412, 424, 835 P.2d 627, 633 (1992) (noting that public policy "favors the finality of negotiated settlements that avoid the costs and uncertainties of protracted litigation") (citation omitted). In every settlement, the agreed upon amount undoubtedly is not the "best case scenario" for either side, but rather is a compromise of their respective positions to avoid the multiple risks of trial where they might face their "worse case scenario." Naturally, the compromise range of a claim will be different at different points in time based upon what is known, or reasonably foreseeable, at the time of the compromise, including the state of the law. In this respect, there are many variables that experienced lawyers routinely consider in weighing the potential risks and rewards inherent in going forward with litigation against the certainty of a compromise solution. This court has enumerated some of these factors in determining whether a settlement was made in good faith, such as:

> (1) the type of case and difficulty of proof at trial, *e.g.,* rear-end motor vehicle collision, medical malpractice, product liability, etc.; (2) the realistic approximation of total damages that the plaintiff seeks; (3) the strength of the plaintiff's claim and the realistic likelihood of his or her success at trial; (4) the predicted expense of litigation; (5) the relative degree of fault of the settling tortfeasors; (6) the amount of consideration paid to settle the claims; (7) the insurance policy limits and solvency of the joint tortfeasors; (8) the relationship among the parties and whether it is conducive to collusion or wrongful conduct; and (9) any other evidence that the settlement is aimed at injuring the interests of a non-settling tortfeasor or motivated by other wrongful purpose.

*Troyer v. Adams,* 102 Hawaiʻi 399, 427, 77 P.3d 83, 111 (2003). In other words, whether the fair settlement value would have been

greater than the actual settlement itself is a matter that would be nearly impossible for a lay person to determine without guidance from expert legal testimony. Moreover, the fact that the settlement was less than the potential recovery in the underlying product liability cases does not mean that the plaintiffs suffered damages as a result of fraud. Rather, the fraud damage claim would be the difference between the fair settlement value absent fraud and the amount of the plaintiffs' actual settlement. As one court indicated:

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. In fact[,] there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

*In re Warner Commc'ns Sec. Litig.*, 618 F.Supp. 735, 745 (S.D.N.Y.1985) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n. 2 (2d Cir.1974)) (ellipsis and other citations omitted).

For these same reasons, the question whether DuPont's fraudulent misrepresentation caused damage to the plaintiffs in this case by preventing them from receiving the "fair compromise value" of their claims is one upon which the trier of fact must be guided by expert legal testimony. Accordingly, we hold that the circuit court did not err in concluding that "expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each [p]laintiff's case" is required.

### d. *the plaintiffs' failure to meet their burden of proof as a matter of law*

▮ We next address whether the plaintiffs produced sufficient evidence—in the form of expert testimony—to defeat summary judgment. Preliminary, we recite the well-settled legal principles governing motions for summary judgment—specifically, that

> [a] summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is ad-

dressed. In effect, the moving party takes the position that he or she is entitled to prevail because his or her opponent has no valid claim for relief or defense to the action. Accordingly, *the moving party has the initial burden of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. The moving party may discharge his or her burden by demonstrating that[,] if the case went to trial[,] there would be no competent evidence to support a judgment for his or her opponent. Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 ... (1986) (*a party moving for summary judgment* under Federal Rules of Civil Procedure Rule 56 *need not support his or her motion with affidavits or similar materials that negate his or her opponent's claims, but need only point out that there is [an] absence of evidence to support the opponent's claims* ). For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless.

> When a motion for summary judgment is made and supported,

> > an adverse party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or as otherwise provided in HRCP Rule 56, must set forth *specific facts showing that there is a genuine issue for trial.* If he or she does not so respond, summary judgment, if appropriate, shall be entered against him or her.

> HRCP Rule 56(e) (1998) (emphasis added). In other words, *a party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, nor is he or she entitled to a trial on the basis of a hope that he can produce some evidence at that time.* On motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party.

*Young v. Planning Comm'n of the County of Kaua'i*, 89 Hawai'i 400, 407, 974 P.2d 40, 47 (1999) (internal quotation marks, citation, and original brackets omitted) (emphases added). Moreover, "[t]he evidentiary stan-

dard required of a moving party in meeting its burden on a summary judgment motion depends on whether the moving party will have the burden of proof on the issue at trial." *Ocwen Fed. Bank, FSB v. Russell,* 99 Hawai'i 173, 182, 53 P.3d 312, 321 (App.2002) (citation omitted). Where the moving party is the defendant, who does *not* bear the ultimate burden of proof at trial, *summary judgment is proper when the non-moving party-plaintiff*

> *fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.* In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Hall v. State,* 7 Haw.App. 274, 284, 756 P.2d 1048, 1055 (1988) (emphasis added) (internal quotation marks and citations omitted). Bearing the foregoing principles in mind, we now turn to the issue at hand, *i.e.,* whether the plaintiffs' expert reports are "legal[ly] sufficien[t]" to sustain their claims against DuPont such that, "if the case went to trial[,] there would be ... competent evidence to support a judgment" in their favor. *Young,* 89 Hawai'i at 407, 974 P.2d at 47 (internal quotation marks and citations omitted).

In this case, the plaintiffs proffered reports of their economic expert and attorney experts as evidence of damages. As indicated above, one factor among many relevant factors in determining the fair compromise value of a particular claim on the date of settlement is the validity—or lack thereof—of the plaintiffs' claim for damages at the time of trial: "The nature of the injuries in the foregone tort action are relevant only to the extent of how they would affect the value of the claim to be compromised[.]" *DiSaba-*

*tino,* 635 F.Supp. at 355. Indeed, such factor requires the application of economic principles to ascertain the reasonably certain future income/profits of the plaintiffs in a particular market, and, thus, economic experts would likely be necessary to aid the jury in determining the underlying tort damages at least in the context of how those economic damages affect the settlement value, if at all.

The plaintiffs' economic expert reports (prepared by David J. Weiner of Valvoulis and Weiner) revealed that McCully sustained damages in the sum of $11,847,889.00, Willman in the sum of $3,278,202.00, Isa in the sum of $967,222.00, and the Takas in the sum of $649,871.00. Weiner calculated the total value of each plaintiff's underlying product liability claim, beginning with the alleged first day of Benlate loss through June 2005—ten years after their settlements. However, the submission of the economic reports does not negate the fact that the plaintiffs are also required to adduce evidence—via *attorney* expert testimony—as to the factors that must be considered when determining the fair compromise value for each of the plaintiffs' cases. In that regard, the plaintiffs presented reports from five attorneys, designated as experts, four of whom had litigated the underlying product liability actions. They were: (1) Wayne D. Parsons, who along with Kevin A. Malone [12] (a Florida attorney) represented Isa and the Takas; (2) J. Richard Peterson, who represented Willman; (3) Judith Pavey, who negotiated Willman's settlement; (4) George W. Playdon, Jr., who represented McCully; and (5) Jeffrey S. Portnoy, the only designated expert not involved in the underlying product liability cases.

According to the circuit court, however, the aforementioned attorney expert reports, as discussed more fully *infra,* were insufficient as a matter of law to establish the plaintiffs' damages. Specifically, the circuit court ruled that:

> [The p]laintiffs have not submitted the expert testimony required to sustain their burden of proof on the proper measure of damages in their cases. The deadlines for

---

12. Malone "represented over 200 similarly situated plaintiffs in Hawai'i and Florida and in

other cases filed across the country." *Matsuura I,* 102 Hawai'i at 151, 73 P.3d at 689.

[the p]laintiffs to submit their final expert reports and amend their pleadings were October 15, 2004, and December 14, 2004, respectively. This court previously made clear that expert reports were to be final and that the experts would not be allowed to testify on matters beyond their respective reports in its Order Related to Trial Procedures, filed May 6, 2004. [The p]laintiffs are therefore unable to prove the fact or amount of settlement fraud damages as a matter of law, and summary judgment is granted on all remaining claims herein.

(Emphasis omitted.) The plaintiffs, however, contend that the circuit court "ignored the numerous expert attorney [d]eclarations which [the p]laintiffs did, in fact, submit to substantiate their damages." The plaintiffs argue that their legal experts "averred that the valuation of [the p]laintiffs' cases would have been substantially higher had the truth of DuPont's duplicity been known." Conversely, DuPont maintains that the plaintiffs

cannot establish [ ]either the fact [ ]or the amount of damage. [The plaintiffs] cannot meet this burden for a variety of reasons, the pertinent one here being that they simply cannot prove the correct measure of fraud damage based upon the way they have positioned this case. They have no expert testimony to provide assistance to the jury on how to evaluate [the] fair compromise value of each [of the plaintiffs'] claims, what the pertinent settlement factors would be and how they would be applied in this case, nor what methodologies could be used to determine what those amounts should be.

(Emphasis omitted.)

As previously stated, although the determination of damages is an ultimate issue to be decided by the trier of fact, damages must be based on evidence that shows loss with reasonable certainty and eliminates speculation. *Chung*, 62 Haw. at 605, 618 P.2d at 291 ("[T]he rule that uncertainty as to the amount does not necessarily prevent recovery is not to be interpreted as requiring no proof of the amount of damage. The extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing

or conclusion founded upon mere speculation or guess." (Citation omitted.)).

Parsons' report described the documents that were not properly produced during discovery in the product liability cases by DuPont and contended that these documents "would have proven or tended to prove that Benlate caused the damages and losses to crops suffered by [his] clients." Parsons, therefore, concluded that the concealed documents would have "increased the strength of the liability cases for [the p]laintiffs" and the plaintiffs "would have been in a stronger position regarding settlement." Parsons further concluded that:

The decision of whether to settle the case for the amount offered by DuPont to an individual client, or to take the case to trial before a jury is ultimately the decision of the client. *In the Hawai'i [product liability] case that I handled, additional evidence supporting the proposition that Benlate could cause damage to my client's crops would have reduced the risk of going to trial.* The client would have been informed about the risk of going to trial in terms of the strength of the [p]laintiffs' liability claims as well as the strength of the clients' damages claims. *If the client rejected their settlement offer, we would have been prepared to take the claim before a jury, in any event, and knowing the [concealed documents] would have made the plaintiffs' case stronger when taking an individual case to trial if the client rejected DuPont's settlement offer.*

(Emphases added.)

Peterson's report opined that, had he and his client, Willman, had the concealed information, "it most definitely would have a substantial difference in [their] analysis of liability/causation in the case against DuPont. The information, taken as a whole, would have greatly strengthened Mr. Willman's claim that Benlate was defective and the cause of his crop damage and loss." Peterson believed that had

*Willman known in September 1994 all the information[,] he would have rejected Du-Pont's settlement amount paid to him and gone to trial.* The information is strong and persuasive that Benlate was defec-

**304**

tive[.] ... *Willman's case would have been substantially stronger*[.]

(Emphases added.)

Pavey's report averred that:

It has been 10 years since we settled those cases, but I recall [that] we discussed and applied the same range of probability of winning on negligence/product defect to all of the cases.

Our liability assessment was made on the basis of the evidence which had been produced by DuPont, evidence developed by us as of the time of settlement and, to some extent, on prior trial and settlement outcomes. It is clear to me that DuPont fraudulently withheld significant evidence from us and even more from plaintiffs who tried or settled their cases prior to the time our clients settled.

*It is my opinion that had DuPont not fraudulently withheld the evidence in the cases which were tried prior to our settlement, DuPont would probably have lost all of those cases on the issues of negligence and product defect.* I know for a fact that some of the cases that settled prior to our cases would have either been settled for substantially higher sums or gone to trial had DuPont refused to pay a fair settlement[.]

We represented many clients, some of whom had a lengthy track record of being successful nurserymen and farmers, other who did not. There were individual causation and damages issues that also figured into our settlement evaluations. However, *I can say without hesitation that had the previous trials all resulted in finding against DuPont on negligence and product defect, my evaluations of our client's claims would have been higher* because, typically, it is true that the stronger the liability case, the more value both sides assign to any damages claim.

(Emphases added.) Playdon also stated that, in his opinion, "the concealment and/or misrepresentation of factual information by DuPont impaired [his] ability to fairly evaluate the status of [his] client's [product liability] litigation." He asserted that the information would have made a "substantial difference" in his analysis regarding "the strength of the liability/causation cases" against DuPont. Playdon concluded that, if the information had been properly disclosed, he "would not have recommended [his] client settle his claim for the amount DuPont offered during negotiations" because,

[i]n [his] opinion, *the value of [his] client's economic losses greatly exceeded the value of the settlement which was negotiated.* In [his] opinion, assuming timely and appropriate access to all of the information[,] and further *assuming that ... DuPont would not and did not offer any settlement consideration greater than that which was in fact paid to settle [his] client's underlying Benlate litigation claim, [he] would have taken the claims before a jury.*

(Emphases added.)

 Lastly, the plaintiffs indicated in their answers to DuPont's June 4, 2004 interrogatories that "Portnoy's opinion will not be based on any particular documents of [the plaintiffs] relating to the prior Benlate product litigation, but will be based on [the] general litigation experience of Mr. Portnoy." Consequently, in his report, Portnoy explained the general litigation and settlement practices and concluded that "had [he] been representing these claimants, the settlement value of the cases would have been dramatically impacted had the wrongfully withheld information been available" and "would have significantly increased." [13] In sum, the plaintiffs' experts offered essentially two opinions, to wit, that, if the plaintiffs and/or their attorneys had known about the concealed evidence, (1) they would not have settled and would have proceeded to trial and (2) the

---

**13.** In their answers to DuPont's interrogatories, the plaintiffs also stated that Stanley Roehrig, counsel for the plaintiffs in another Benlate product liability case, *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 948 P.2d 1055 (1997), "may be called to testify regarding the nature of damages claimed in that action, and the damages awarded by the jury in that action." However, the record does not reflect that Roehrig submitted an expert report. Nonetheless, assuming that he would be permitted to testify, Roehrig's testimony would be directed only as to what another jury did in another case.

valuation of the plaintiffs' cases would have been "substantially higher."

Viewing the evidence in the light most favorable to the plaintiffs, as the nonmoving party, *Lau v. Bautista*, 61 Haw. 144, 147, 598 P.2d 161, 163 (1979), we agree with the circuit court's implicit ruling that the plaintiffs have not demonstrated the existence of a genuine issue of material fact as to damages to defeat summary judgment. As indicated above, the plaintiffs' attorney experts merely presented conclusory opinions that would do little to assist a jury. Of crucial importance is the fact that none of the attorney experts provide any opinion testimony as to what specific settlement factors were or should be considered in settling each of the plaintiffs' underlying product liability cases and the evaluation of how those factors would have been altered had they known about the concealed evidence. Although the plaintiffs have filed their claims jointly, they each have separate claims against DuPont, and each of their claims must be individually established. The experts did not explain how DuPont's conduct affected the plaintiffs' evaluation such that they would have settled for more, what each plaintiff claimed as his damages in the product liability cases at the time he settled and what he recovered, and how the settlement factors would apply to each plaintiff's case. It is not sufficient for an expert to simply state that he or she believed that, had the concealed evidence been known, the settlement value would have been greater because the existence of the concealed evidence strengthened the liability aspect of the litigation. *See Acoba v. Gen. Tire, Inc.*, 92

Hawai'i 1, 14, 986 P.2d 288, 301 (1999) ("Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment[,] an expert opinion must be more than a conclusory assertion about ultimate legal issues." (Internal quotation marks and citation omitted.)); *see, e.g., Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed.Cir.1999) (ruling that the federal district court properly characterized patent attorney expert's statement as conclusory because the statement was an assertion without further explanation); *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed.Cir.1998) (reasoning that conclusory expert declarations devoid of facts upon which the conclusions were reached fail to raise a genuine issue of material fact to resist summary judgment); *Burrow v. Arce*, 997 S.W.2d 229, 235–36 (Tex. 1999) (holding that the attorney expert affidavit stating that he considered the relevant facts and concluded that the settlements were fair and reasonable was conclusory because he did "not explain *why* the settlements were fair and reasonable for each of the [plaintiffs]") (emphasis added); *Griswold v. Kilpatrick*, 107 Wash.App. 757, 27 P.3d 246, 248–49 (2001) (the plaintiff's expert testimony that, but for the delay in prosecuting the case, the claim would have settled for a larger sum was speculative and conclusory and therefore insufficient to create a genuine issue of material fact in a legal malpractice case). The unsubstantiated conclusions of the plaintiffs' experts are insufficient to raise a genuine issue of material fact that would preclude summary judgment.[14] The circuit

14. We are unconvinced by the dissent's bald assertion that, "[e]ven if the 'fair compromise value' is used as a basis for calculating damages, [the p]laintiffs have sufficiently identified 'compromise factors' to put the 'fair compromise value' in issue," *i.e.*, creating "genuine issues of material fact as to the fairness of the prior settlement[.]" Dissent Op. at 377, 172 P.3d at 1061. The dissent fails to cite to any authority in support of its position that the conclusory statements found in the aforementioned attorney expert reports are sufficient to create genuine issues of material fact. Instead, the dissent simply asserts that "evidence and inferences must be viewed by this court in a light more favorable to the nonmoving [p]laintiffs." (Internal quotation marks, citation, and original brackets omitted.) *Id.* Although the dissent correctly relates the principle

in reviewing an award of summary judgment, such principle does not negate the fact, as the dissent even acknowledges, that expert affidavits "must at least include *the factual basis and the process of reasoning which makes the conclusion viable* in order to defeat a motion for summary judgment." (Emphasis added.) (Internal quotation marks and citation omitted.) *Id.* at 376, 172 P.3d at 1060 n. 4. Yet, the dissent mistakenly believes that the expert reports, which merely "opined that the settlement value was higher than that for which the case was previously settled, were clearly based on facts and inference drawn thereon." *Id.* As stated above, for plaintiffs' experts to opine that the plaintiffs would not have settled and would have proceeded to trial had they known of the concealed documents, or that the concealed information would have in-

court properly concluded that the plaintiffs are "unable to prove the fact or amount of settlement fraud damages as a matter of law." Accordingly, we hold that the circuit court was correct in granting summary judgment in favor of DuPont.[15]

e. *the plaintiffs' alternative argument*

Notwithstanding the foregoing, the plaintiffs maintain that:

creased the strength of their product liability cases, does not render such opinion sufficient to identify the compromise factors of the plaintiffs' particular cases. Even assuming, but not agreeing, that the attorney expert reports sufficiently identified the compromise factors, the reports fail to set forth how those factors applied to each of their cases.

Moreover, the dissent, relying upon HRE Rule 702 (governing admissibility of expert testimony), points out that the attorney expert reports "would have been admissible at trial." Dissent Op. at 376, 377, 172 P.3d at 1058, 1060–61. We disagree. As previously quoted, Rule 702 provides in relevant part that "[i]f scientific, technical, or other specialized knowledge *will assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." (Emphasis added.) As discussed supra, the plaintiffs' attorney experts' reports simply consisted of conclusory opinions, which would have provided "no assistance to the jury, and therefore should not be admitted" pursuant to HRE Rule 702. *Batangan,* 71 Haw. at 558, 799 P.2d at 52 (observing that, expert testimony that merely states a legal conclusion and that does not assist the jury in its determination is excludable under Rule 702).

15. The plaintiffs additionally argue that the circuit court's ruling exceeded the bounds of reason and disregarded rules or principles of law or practice to the plaintiffs' substantial detriment. First, the plaintiffs maintain that, at the same time DuPont was asserting that the proper measure of damages was the fair compromise value, it reserved the right to argue that such damages were speculative. DuPont, however, contends that, because there is no controlling Hawai'i law, it reserved the right to later argue the minority position that settlement fraud damages are inherently speculative. Nonetheless, the plaintiffs do not explain how DuPont's reservation would prejudice them. Second, the plaintiffs argue that they were prejudiced by DuPont's inconsistent position throughout this litigation that it "would never have paid any more to settle the plaintiffs' claims than was in fact paid in settlements"; again, the plaintiffs did not explain how they were prejudiced by DuPont's assertion and such assertion is irrelevant to the determination of the issues in this appeal. Third, the plaintiffs con-

At the time [they] responded to DuPont's discovery, and submitted their final expert reports for trial, [16] they believed (and still believe) that Hawai'i law allowed for recovery of the losses they sustained "naturally" and "proximately" from DuPont's misrepresentations, without limitation. Their trial preparation reflected this expectation of the availability of general damages for fraud.

tend that they were prejudiced because DuPont's experts did not offer opinions on the fair compromise value in their written reports. Indeed, the dissent takes issue with DuPont's attorney expert reports, stating that:

It would be ironic to sustain summary judgment in this case because apparently [DuPont] itself never named an expert attorney regarding "fair compromise value" factors prior to the expert deadline and before the court's summary judgment ruling.

Dissent Op. at 378, 172 P.3d at 1062. However, as DuPont points out, the burden is upon the plaintiffs to prove damages, and the plaintiffs cannot complain that DuPont did not establish a prima facie element of *the plaintiffs'* case. As previously stated, DuPont, as the moving party in a motion for summary judgment, "may discharge [its] burden by demonstrating that[,] if the case went to trial[,] there would be no competent evidence to support a judgment for [the plaintiffs]." *Young,* 89 Hawai'i at 407, 974 P.2d at 47 (citation omitted); *see also* 10A Wright, Miller & Kane, Federal *Practice and Procedure: Civil 3d* § 2727, at 474 (1998) ("[I]t is not necessary for the movant to introduce any of proof at trial, the movant can seek summary judgment by establishing that the opposing party has insufficient evidence to prevail as a matter of law[.]"); *Stallard v. Consol. Maui, Inc.,* 103 Hawai'i 468, 83 P.3d 731 (2004) ("As the Federal Rules of Civil Procedure are substantially similar to the HRCP," "this court can look to parallel federal law for guidance." (Internal quotation marks and citation omitted.)).

Finally, the plaintiffs argue that they were prejudiced because DuPont asserted attorney-client privilege regarding their analysis of the plaintiffs' underlying product liability cases. However, the discussions between DuPont and its attorneys have no relevance to the determination of the fair settlement value. The plaintiffs provide no explanation as to how they were prejudiced by DuPont's assertion of privilege.

16. As previously indicated, the parties had submitted their final expert reports by the time DuPont brought its motion for summary judgment based on the plaintiffs' inability to prove damages. The circuit court had also made clear that the parties' experts would not be allowed to testify on matters beyond their respective reports.

... [T]he possibility of the [c]ircuit [c]ourt imposing a limited "settlement fraud" remedy was unknown to the parties and was not foreseeable under Hawaii law at the time [the p]laintiffs obtained their reports, and answered discovery[.]

Consequently, the plaintiffs request that, "[s]hould this [c]ourt ultimately adopt the settlement differential as the prevailing measure of damages," i.e., the fair compromise value absent the fraud, they should "be given the opportunity (on remand) to make an appropriate record for such purpose." Stated differently, the plaintiffs believe that, because it was "unknown" and "not foreseeable" that the circuit court would adopt the fair compromise value as the measure of damages in settlement fraud actions, their case should be remanded to allow their legal experts an opportunity to present their opinions regarding the fair compromise value of the case absent the fraud.

In the instant case, DuPont filed a motion for summary judgment, asserting that the plaintiffs' damages were limited to the "fair compromise value" of their released tort claims at the time of settlement. In opposition thereto, the plaintiffs maintained—as they had up to the time DuPont filed the subject motion for summary judgment—that their damages should not be so restricted and should be extended to the judgment value of their released claims. In giving the benefit of the doubt to the plaintiffs, we presume that DuPont's theory of damages was either first raised, or only became clear, upon the filing of its motion for summary judgment. Therefore, it can hardly be said, as the plaintiffs contend, that it was "not foreseeable" for the circuit court to conclude that the measure of damages would be the fair compromise value, especially in light of the arguments advanced by DuPont in its

motion for summary judgment.[17] Clearly, this is not a case where the circuit court *sua sponte* rendered an outcome that could not have been expected by the parties.

More importantly, the opportunity the plaintiffs now seek, i.e., to allow their experts the opportunity to opine regarding the fair compromise value of the case absent the fraud, was available to them, via HRCP Rule 56(f) (2007), at the time the circuit court was considering DuPont's motion for summary judgment. HRCP Rule 56(f) states that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, *the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.*

(Emphases added.) Rule 56(f)—like its federal counterpart, Federal Rules of Civil Procedure (FRCP) Rule 56(f),—provides a mechanism for litigants to seek a continuance or avoid summary judgment when they "need[ ] to discover essential facts" to justify their opposition. *Hall v. State of Hawai'i,* 791 F.2d 759, 761 (9th Cir.1986) (stating that FRCP Rule 56(f) empowers the court to continue or deny a motion for summary judgment "if the opposing party needs to discover essential facts" to justify the opposition) (citation omitted); *see also Stallard v. Consol. Maui, Inc.,* 103 Hawai'i 468, 475, 83 P.3d 731, 738 (2004) ("As the [FRCP] are substantially similar to the HRCP, we look to federal case law for guidance."). The purpose of Rule 56(f) is "to provide an additional safeguard against an improvident or premature grant of summary judgment." *Price v. Gen. Motors*

---

**17.** The dissent contends that "[i]t was not until the February 28, 2005 order, [i.e., the order granting DuPont's motion for summary judgment,] that [the p]laintiffs were made aware of the specific standard to which their response would be held." Dissenting Op. at 376–77, 172 P.3d at 1058–59. However, the dissent fails to take into account that the plaintiffs were placed on notice of [DuPont]'s position on damages—at the latest—when DuPont filed its motion for summary judgment. Rather, the dissent baldly

and mistakenly states that the fact "[t]hat [the p]laintiffs may have been put on notice of DuPont's position ... has nothing to do with the fact that [the p]laintiffs were not made aware of the specific damages standard that would be adopted by the court until the February 28, 2005 order." *Id.* (emphasis added) (internal quotation marks and citation to the majority opinion omitted). Indeed, as indicated *infra,* the plaintiffs cannot wait until after DuPont prevails on its stated theory to seek an alternative remedy.

*Corp.*, 931 F.2d 162, 164 (1st Cir.1991) (internal quotation marks and citation omitted). Moreover,

> [t]he rule should be applied with a spirit of liberality. Although discovery need not be complete before a case is dismissed, summary judgment is proper only if the non-movant has had adequate time for discovery. To this end, Rule 56(f) allows a party to request a delay in granting summary judgment *if the party can make a good faith showing that postponement of the ruling would enable it to discover additional evidence which might rebut the movant's showing of the absence of a genuine issue of material fact. The party is required to show what specific facts further discovery might unveil.*

*McCabe v. Macaulay*, 450 F.Supp.2d 928, 933 (N.D.Iowa 2006) (emphasis added) (internal quotation marks, citations, original brackets omitted) (format altered); *Acoba v. General Tire, Inc.*, 92 Hawai'i 1, 11–12, 986 P.2d 288, 298–99 (1999) (an HRCP Rule 56(f) affidavit must provide valid reasons why a continuance is necessary and demonstrate specifically how postponement would enable rebuttal); *Josue v. Isuzu Motors Am., Inc.*, 87 Hawai'i 413, 416, 958 P.2d 535, 538 (1998) (same). In sum, the circuit court has the discretion to "deny the motion for summary judgment, order a continuance for additional discovery or make 'such other order as is just.'" *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir.1993) (footnote omitted); *see also Josue*, 87 Hawai'i at 416, 958 P.2d at 538 ("A [circuit] court's decision to deny a request for continuance pursuant to HRCP Rule 56(f) will not be reversed absent an abuse of discretion." (Citation omitted.)).

Here, rather than request a continuance of the hearing "to permit affidavits to be obtained or depositions to be taken or discovery to be had or . . . [to seek] such other order as is just," HRCP Rule 56(f), the plaintiffs continued to assert their contrary position on damages, disregarding DuPont's position and the fact that the circuit court might be persuaded to adopt DuPont's view of the measure of damages. Having failed to request a Rule 56(f) continuance, the plaintiffs cannot now complain that the circuit court—based on the submissions by the plaintiffs—granted summary judgment in favor of DuPont.[18] *Weinberg v. Whatcom County*, 241 F.3d 746, 751 (9th Cir.2001) (internal quotation marks, citation, and original brackets omitted) (interpreting FRCP Rule 56(f) and holding that the district court properly granted summary judgment in favor of the defendants when the plaintiff "never moved the court under Rule 56(f) for additional time to obtain expert testimony necessary to substantiate his allegations of damages"); *see also Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 832–33 (10th Cir.1986) ("where a party opposing summary judgment and seeking a

---

18. We are mindful that, at the time DuPont filed the subject motion for summary judgment, final expert reports had been submitted pursuant to the circuit court's pretrial scheduling order and that the circuit court had declared that testimony outside of the experts' respective reports would not be allowed. Indeed, the dissent so observes and contends that the pretrial scheduling order "thus barred the possibility of a continuance for further discovery." Dissenting Op. at 381, 172 P.3d at 1065 (footnote omitted). However, inasmuch as Rule 56(f) "should be applied with a spirit of liberality," *McCabe*, 450 F.Supp.2d at 933, and given the wide discretion afforded to the circuit court, *see Josue*, 87 Hawai'i at 416, 958 P.2d at 538 (citation omitted), to "make such other order as is just," HRCP Rule 56(f), any grant by the circuit court of a continuance to allow further discovery and the submission of additional evidence from the plaintiffs' experts to rebut DuPont's position would have, in our view, indicated the circuit court's implicit ruling that its prior limitation on expert testimony would be lifted with respect to the additional evidence. *See Spiller v. Ella Smithers Geriatric Ctr.*, 919 F.2d 339, 343 (5th Cir.1990) (indicating that, by allowing defendant to move for summary judgment after cut-off date for pretrial motions, district court impliedly granted motion to amend scheduling order). Thus, the dissent's contention that "[the p]laintiffs could not have appropriately moved to continue the decision on [Dupont]'s motion for summary judgment," dissenting op. at 380, 172 P.3d at 1064, because of the circuit court's pretrial scheduling order overlooks the plain reading of HRCP Rule 56(f), which confers upon the circuit court the authority to "make such other order as is just." Moreover, although the deadline for submission of expert reports had expired by the time the circuit court entered its ruling on DuPont's summary judgment, *i.e.*, on February 28, 2005, the discovery cut-off had not yet expired. The discovery cut-off date was set for April 14, 2005.

continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) ..., there is no abuse of discretion in granting summary judgment").[19]

 To permit the plaintiffs to now establish another record relating to the proof of damages, after unsuccessfully maintaining their position and failing to take advantage of the Rule 56(f) remedy available to them, would entitle them to two bites of the apple.[20] *Daiichi Hawai'i Real Estate Corp. v. Lichter*, 103 Hawai'i 325, 348, 82 P.3d 411, 434 (2003) (in an action seeking to vacate the arbitration decision, this court stated that it "cannot accept that parties have a right to keep two strings to their bow—to seek victory before the tribunal and then, having lost, seek to overturn it for bias never before

claimed"). Accordingly, in our view, the plaintiffs waived their opportunity to secure further opinions from their experts to submit to the circuit court and cannot now raise it on appeal. *See generally Chung v. McCabe Hamilton & Renny Co.*, 109 Hawai'i 520, 537, 128 P.3d 833, 850 (2006) ("the failure to properly raise an issue at the [circuit] level precludes a party from raising that issue on appeal") (internal quotation marks and citation omitted); *see also Avila v. Travelers Ins. Co.*, 651 F.2d 658, 660 (9th Cir.1981) (stating that "[a] contention by an opposing party that he had insufficient time in which to present specific facts in opposition to the motion [for summary judgment] normally cannot be successfully raised for the first time on appeal") (citation omitted).[21]

19. The United States Court of Appeals for the Third Circuit, in *Mid–South Grizzlies v. National Football League*, 720 F.2d 772 (3d Cir.1983), noted that "most courts which have considered the issue agree that [compliance with the requirements of Rule 56(f)] is necessary for the preservation of a Rule 56(f) contention that summary judgment should be delayed pending further discovery" and cited to a collection of cases for the aforementioned proposition. *Id.* at 780 n. 4.

20. Given the remedy available pursuant to HRCP Rule 56(f), we cannot agree with the dissent that "the **only opportunity** [the p]laintiffs would have had to acquire expert testimony re-evaluating their fraud claims ... would have been <u>after</u> the court made its February 28, 2005 order granting summary judgment." (Dissenting Op. at 381, 172 P.3d at 1065 (bold emphasis added) (underscored emphasis in original)).

Moreover, the dissent's contention that, "per the ... February 28, 2005 order, [the circuit court] was not disposed to grant any motion for further discovery even if [the p]laintiffs moved for such discovery" is nothing more than mere speculation. Dissenting Op. at 382, 172 P.3d at 1066. However, inasmuch as the plaintiffs failed to move for a Rule 56(f) continuance, the circuit court was not presented with an opportunity to pass on the issue. *Cf. State v. Kotis*, 91 Hawai'i 319, 340, 984 P.2d 78, 99 (1999) (holding that the defendant "had the opportunity to raise the issue [ (now challenged on appeal) ] ... in the circuit court, but he did not do so. Inasmuch as he is the party alleging error, it was his burden to raise the issue, and any ambiguity in the circuit court's ruling may therefore be attributed to him"). Interestingly, the dissent criticizes the majority for "speculat[ing] that the [circuit] court might have granted a Rule 56(f) continuance" if the plaintiffs had so requested. Dissenting Op. at 382, 172 P.3d at 1066. However, we do not

opine as to whether the circuit court would have granted the request for a continuance; rather, as indicated above, the plaintiffs did not even request such relief, and, thus, the circuit court was not given a chance to rule on the matter. Had the motion been raised and a ruling made, the issue would properly be before this court to review whether the circuit court abused its discretion in granting or denying the request. *See Josue*, 87 Hawai'i at 416, 958 P.2d at 538 (a denial of "a request for continuance pursuant to HRCP Rule 56(f) will not be reversed absent an abuse of discretion") (citation omitted). However, such is not the case here.

21. The dissent contends that, "[i]nasmuch as HRCP Rule 56(f) was not raised by any party but by the majority *sua sponte* ..., under the circumstances it is not properly before this court[,]" dissenting op. at 380, 172 P.3d at 1064 (emphasis omitted), "is wholly irrelevant to the facts[,]" *id.*; and, that by applying HRCP Rule 56(f), we "ha[ve] given [DuPont] another 'bite at the apple[,]' " *id.* at 380, 172 P.3d at 1064. The relevance of HRCP Rule 56(f) is triggered by the plaintiffs' alternative argument that the case be remanded in order to allow their experts the opportunity to opine regarding the fair compromise value and to present such evidence to the circuit court. As discussed *supra*, the plaintiffs had at their disposal the procedural mechanism, *i.e.*, Rule 56(f), to do exactly what they now seek. Moreover, as previously discussed, the possibility that the circuit court might elect the fair compromise value as the measure of damages was not unforeseeable nor unknown to the plaintiffs. Finally, we reiterate that DuPont was the prevailing party at the circuit court; the plaintiffs, as the non-prevailing party and the appellant on appeal, have the burden of demonstrating that they are entitled to the relief sought before this court. *See Bettencourt v. Bettencourt*, 80 Hawai'i

### 2. The Plaintiffs' Remaining Contention

The plaintiffs also challenge the circuit court's order granting DuPont's motion for summary judgment based on the test results conducted by Alta Analytical Laboratories, Inc. (Alta).[22] They contend, *inter alia,* that the circuit court erred in concluding that the Alta test results were "not material" to the plaintiffs when they settled their cases and subsequently dismissed them. However, in light of the foregoing conclusion that the plaintiffs have not presented sufficient evidence on damages to defeat summary judgment, we need not address the instant issue.

### B. *DuPont's Cross–Appeal*

On cross-appeal, DuPont raises an additional basis to affirm the circuit court's judgment. Specifically, DuPont challenges that part of the circuit court's order denying its first motion for summary judgment as to the plaintiffs' fraud claims, contending that the

225, 230, 909 P.2d 553, 558 (1995) ("[t]he burden is upon appellant in an appeal to show error by reference to matters in the records") (internal quotation marks and citation omitted). As stated in *Costa v. Sunn,* 5 Haw.App. 419, 697 P.2d 43 (1985):

> [T]he burden is on appellant to convince the appellate body that the presumptively correct action of the circuit court is incorrect.... So great is the burden on appellant to overcome the presumption of correctness that appellee's failure to file an answering brief does not entitle appellant to the relief sought from the appellate court, even though the court may accept appellant's statement of facts as correct. *Id.* at 430, 697 P.2d at 50–51 (citing HRAP Rule 30) (other citations omitted). Thus, it can hardly be said that DuPont is being afforded a second bite at the apple.

22. Alta was hired on behalf of DuPont to conduct tests of soil and water collected from the properties of certain plaintiffs who had brought Benlate claims against DuPont. Alta was one of the few laboratories, if not the only one in the United States, capable of performing the sophisticated soil and water analysis to determine whether the Benlate was contaminated.

During the course of litigating the products liability actions, the following were concealed, withheld, and fraudulently misrepresented by DuPont: (1) the Alta test results; (2) the test results conducted in Monte Vista, Costa Rica, demonstrating that Benlate was harmful to plants; and (3) the tests performed by A & L

circuit court erred in failing to dismiss the fraud claims. However, based on the above discussion, we need not reach DuPont's cross-appeal inasmuch as it is essentially moot. Indeed, as DuPont maintains, its cross-appeal was "filed only in the event this court reverses the [circuit court's] dismissal of the entire case."

## IV. CONCLUSION

Based on the foregoing, we affirm the circuit court's August 10, 2005 judgment.

Dissenting Opinion by ACOBA, J.

With all due respect, I must come to the conclusion that the circuit court of the third circuit (the court) did not properly grant summary judgment in favor of Defendant–Appellee/Cross–Appellant E.I. Du Pont de Nemours and Company (Defendant). The record indicates that (1) in relevant part the court's May 6, 2004 order[1] instructed the

Midwest laboratories and by DuPont's in-house testing facilities.

1. The court's May 6, 2004 order entitled, "Order Related to Trial Procedures," states in its entirety:

> Pursuant to agreement by the parties at a telephone conference on April 22, 2004, with Melvin Agena, Esq., Chan Townsley, Esq., and Mark Hutton, Esq. representing the Plaintiffs, and Warren Price, III, Esq., Kenneth Okamoto, Esq., and Susan Yi, Esq. representing Defendants, and having received a letter dated April 23, 2004, from Warren Price, III, Esq., memorializing the matters discussed at the conference,
>
> IT IS HEREBY ORDERED that [P]laintiffs shall be tried in groups. The parties shall confer and select the number and identities of groups of [P]laintiffs whose claims will be tried together. The trials shall follow one another seriatim.
>
> IT IS FURTHER ORDERED that the parties shall confer and agree upon a trial date in 2005 for the first group of [P]laintiffs. The parties shall also confer and agree upon all attendant pretrial deadlines.
>
> IT IS FURTHER ORDERED that, considering the scope of this case and the number of [P]laintiffs involved, the standard deadlines for submission of final expert reports shall be modified. *Plaintiffs, as the parties with the burden of proof, shall submit their final expert report first. After [P]laintiffs submit their final expert reports, Defendant[s] shall be given a reasonable time to submit their final expert re-*

parties to "submit their final expert reports," and directed that "experts will not be allowed to testify on any matters beyond their respective reports"; (2) Plaintiffs–Appellants/Cross–Appellees Exotics Hawaii–Kona, Inc., et al. (Plaintiffs) submitted declarations of their attorney-experts providing opinions regarding the damages that Plaintiffs suffered and such opinions would have been admissible at trial under Hawai'i Rules of Evidence (HRE) Rule 702 (1993) sufficient to present genuine issues of material fact to be tried; (3) in the February 28, 2005 summary judgment order [2] itself, the court for the first time declared that the remedy for fraud was "the fair compromise value of the claim at the time of settlement," and that "[i]n order to meet their burden of proving the fair compromise value at the time of settlement, Plaintiffs would need to [submit] expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each Plaintiff's case"; (4) it was not until that February 28, 2005 order, which granted the motion for summary judgment,

that Plaintiffs were made aware of the specific standard to which their response to Defendant's summary judgment motion would be held and what the court would require of their attorney-expert witnesses other than the deadline set for submission of the expert reports set in the May 6, 2004 order; and (5) even if the "fair compromise value" is used as the basis for calculating damages, Plaintiffs have sufficiently identified "compromise factors" to put the "fair compromise value" of their claims in issue at trial. In light of the foregoing and for the reasons elucidated herein, I would vacate the court's February 28, 2005 order.

I.

"An award of summary judgment is reviewed *de novo* under the same standard applied by the [trial] court." *French v. Pizza Hut, Inc.*, 105 Hawai'i 462, 466, 99 P.3d 1046, 1050 (2004) (citing *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22 (1992) (other citations omitted)).

ports. *The parties shall confer and agree upon deadlines for expert reports.*

*IT IS FURTHER ORDERED that experts will not be allowed to testify on any matters beyond their respective reports.*

IT IS FURTHER ORDERED that at the time the parties meet to confer upon the trial date, trial groups, pretrial deadlines, and expert report deadlines, [P]laintiffs will *state their position on the introduction of evidence at trial* relating to the issue of whether Benlate was defective and/or contaminated. Plaintiffs will memorialize their position at that time and submit it to the [c]ourt and to Defendant[s]. (Emphases added.)

2. The court's February 28, 2005 order entitled, "Order Granting Defendant's Motion for Summary Judgment Based on Plaintiffs' Inability to Prove Damages," states in its entirety:

This matter, having come before the [c]ourt pursuant to Defendant's Motion for Summary Judgement Based on Plaintiffs' Inability to Prove Damages, filed February 3, 2005, and the [c]ourt having reviewed Plaintiffs [sic] Memorandum in Opposition to Defendant's Motion for Summary Judgment Based on Plaintiffs' Inability to Prove Damages, filed February 17, 2005, and Defendant's Reply Memorandum in Support of Defendant's Motion for Summary Judgment Based on Plaintiffs' Inability to Prove Damages, filed February 18, 2005, and the [c]ourt having heard oral argument on February 23, 2005, at 4:00 p.m., from Melvin Agena, Esq.[,] appearing on be-

half of Plaintiffs, and Warren Price, III, Esq., appearing on behalf of Defendants,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is granted. The [c]ourt finds that, as a matter of law, when a [p]laintiff claims to have been fraudulently induced to settle a tort claim because of discovery/litigation fraud, (s)he has two options: (1) to sue to rescind the settlement contract; or (2) to affirm the contract and sue for fraud. If (s)he chooses to sue for fraud, the remedy available to [the p]laintiff is the fair compromise value of the claim at the time of the settlement. In order to meet their burden of proving the fair compromise *value at the time of settlement, Plaintiffs would need to meet this burden with expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each Plaintiff's case. Plaintiffs have not submitted the expert testimony required to sustain their burden of proof on the proper measure of damages in their cases. The deadlines for Plaintiffs to submit their final reports and amend their pleadings were October 15, 2004, and December 14, 2004, respectively. This court previously made clear that the expert reports were to be final and that the experts would not be allowed to testify on matters beyond their respective reports in its Order Related to Trial Procedures, filed May 6, 2004. Plaintiffs are therefore unable to prove the fact or amount of settlement fraud damages as a matter of law, and summary judgment is granted on all remaining claims herein.*

(Emphasis added.) (Boldfaced font omitted.)

The standard for granting a motion for summary judgment is settled:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there *is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.* A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.

*Taniguchi v. Ass'n of Apartment Owners of King Manor, Inc.,* 114 Hawai'i 37, 46, 155 P.3d 1138, 1147 (2007) (emphasis in original) (quoting *Bremer v. Weeks,* 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (other citations omitted)). In a motion for summary judgment, "[a]ll evidence and inferences must be viewed in the light most favorable to the non-moving party." *French,* 105 Hawai'i at 466, 99 P.3d at 1050 (citing *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). Certain burdens are imposed in summary judgment proceedings:

> First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material fact exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.

> Second, the moving party bears the ultimate burden of persuasion. *This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and that the moving part[y] is entitled to summary judgment as a matter of law.*

*Id.* at 470, 99 P.3d 1046, 99 P.3d at 1054 (quoting *GECC Fin. Corp. v. Jaffarian,* 79

Hawai'i 516, 521, 904 P.2d 530, 535 (App. 1995) (citations omitted)) (some emphasis omitted and some added).

As the moving party, Defendant had the burden to demonstrate the absence of any genuine issue of material fact in its motion for summary judgment. Defendant's position was that "it would not have *actually* paid more in settlement than it did." Thus, it was Defendant's burden, as the moving party, to produce admissible evidence that Plaintiffs could not prove damages in excess of the settlement amount and to rebut evidence produced by Plaintiffs that they could prove such damages.

II.

It must first be noted that prior to the court's summary judgment ruling there was a dispute as to the appropriate standard for measuring damages. In their summary judgment motion, filed February 3, 2005, Defendant argued, *inter alia,* that Plaintiffs were limited in their remedies. Citing Delaware law, Defendant maintained that "[w]hen a plaintiff claims to have been fraudulently induced to settle a tort claim—because of discovery/litigation fraud or otherwise—(s)he has two options: (1) sue to *rescind* the settlement contract, or (2) *affirm* the contract and sue for fraud." (Emphases in original.) According to Defendant, if Plaintiffs opted for the first remedy, rescinding, they could "then pursue [their] unliquidated tort claim and have a jury liquidate it, to wit, determine its 'actual judgment value.'" Defendant argues that if, in the alternate, Plaintiffs opted for the second remedy, suing separately for fraud, then their "only claim is for *the fair compromise value* of [their] released tort claim[.]" (Emphasis in original.) Defendant did not dispute that the general objective of fraud damages is "to place the defrauded plaintiff in the position he would have been 'but for' the fraud."

In their memorandum in opposition to Defendant's February 3, 2005 motion, Plaintiffs contended that the "[n]o 'election of remedies' doctrine limits Plaintiffs' claims to a speculative 'reasonable judgment value' in this action." They argued that "[t]he remedy for Plaintiffs' unreleased fraud claims is *to*

*place Plaintiffs' position [sic] absent the fraud."* (Emphasis added.) According to Plaintiffs:

> Whether that position ultimately was a "reasonable settlement" or a claim litigated through trial is for a jury to determine. That decision will hinge on the evidence presented at trial; up till this date, it has been [Defendant's] position *that no greater settlement would ever have been offered with or without fraud.* If a jury accepts that proposition, *the ultimate value of the position lost to fraud necessarily hinges on what value Plaintiff's [sic] underlying claims would have received at trial.*

(Emphases added.)

The court's order of May 6, 2004 directed that "Plaintiffs, as the parties with the burden of proof, shall submit their final expert report first," and "experts will not be allowed to testify on any matters beyond their respective reports." Plaintiffs apparently satisfied that order by submitting their attorney-expert reports by the October 15, 2004 deadline.

On February 28, 2005, the court entered summary judgment for Defendant. In its February 28, 2005 order, the court stated that "when a [p]laintiff claims to have been fraudulently induced to settle a tort claim because of discovery/litigation fraud, (s)he has two options: (1) to sue to rescind the settlement contract; or (2) to affirm the contract and sue for fraud." The court then declared that the remedy for fraud was "the fair compromise value of the claim at the time of settlement[,]" hence affirming Defendant's position.

Additionally, the court stated, "In order to meet their burden of proving the fair compromise value at the time of settlement, Plaintiffs would need to meet this burden with *expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each Plaintiff's case.*" (Emphasis added.) The court concluded that "Plaintiffs have not submitted the expert testimony required to sustain their burden of proof on the proper measure of damages in their cases."

As previously noted, prior to the court's grant of summary judgment, the governing measure of damages was disputed. In this regard Plaintiffs argue that they had no notice regarding the court's aforesaid requirements for the attorney-experts' reports. According to Plaintiffs, "the [court] adopted this limitation [ (setting out requirements for the expert testimonies) ] *only after Plaintiffs had submitted their 'final' expert reports—*all of which had been formulated in anticipation of [the then] prevailing rule of damages for fraud." (Emphasis added.) Plaintiffs maintain that *"[n]or were Plaintiffs informed before that deadline that ... the* written opinions of Plaintiff[s'] *experts were to include the complete bases of the opinion in addition to stating the ultimate opinion themselves."* (Emphases added.)

On the other hand, in its Answering Brief on appeal, Defendant states that the court "merely enforced the proper measure of damages associated with the cause of action brought by [Plaintiffs]." According to Defendant, Plaintiffs "make a nonsensical argument that the [c]ourt cannot enforce its own rules because it 'did not advise [P]laintiffs' that it intended to 'change the nature of [P]laintiffs' remedy' or impose a requirement of expert attorney evidence on compromise factors."

### III.

The majority disputes that Plaintiffs met their burden of proof as to the element of damages because "none of the attorney experts provide any opinion testimony as to what specific settlement factors were or should be considered in settling each of the [P]laintiff's underlying product liability cases and the evaluation of how those factors would have been altered had they known about the concealed evidence." Majority opinion at 305, 172 P.3d at 1049.

The record, however, appears to vindicate Plaintiffs' claims that they were not notified as to what the court would require of their attorney-expert witnesses, other than the deadline set for submission of the reports. In the May 6, 2004 order, the court did not require that the experts produce a settlement value, a judgement value, any other

specific dollar amount related to damages, or that the experts set forth factors according to a particular standard by which damages must be measured. No party was ordered to submit evidence regarding compromise factors in advance of the summary judgment hearing, nor was the designated damages standard defined prior to the summary judgment hearing.

It was not until the February 28, 2005 order, which granted the motion for summary judgment, that Plaintiffs were made aware of the specific standard to which their response would be held. The majority contends that "the dissent fails to take into account that the [P]laintiffs were placed on notice of [Defendant's] position on damages—at the latest—when [Defendant] filed its motion for summary judgment" on February 3, 2005. Majority opinion at 307, 172 P.3d at 1051 n.17. However, that Plaintiffs may have been put "on notice of [Defendant's] position on damages" by virtue of Defendant's summary judgment motion, *id.*, has nothing to do with the fact that Plaintiffs were not made aware of the specific damages standard that would be adopted by the court until the February 28, 2005 order. As the majority itself recognizes, up until the court's February 28, 2005 order, Plaintiffs "continued to assert their contrary position on damages[.]" Majority opinion at 308, 172 P.3d at

1052. In fact, defense counsel's argument during the February 23, 2005 hearing on Defendant's summary judgment motion, that advocated the application of the fair compromise value standard, evinces that the specific standard which governed was still undecided at that time.

In sum, Plaintiffs had no notice that their experts were required to provide "testimony directed to the numerous compromise factors," because until the court decided the summary judgment motion, it had not determined that "the fair compromise value" standard would govern in the case. There was nothing specific the court demanded of the experts until it granted Defendant's motion for summary judgment.[3]

## IV.

Inasmuch as the designated remedy standard was not determined prior to the summary judgment hearing on February 23, 2005, Plaintiffs provided declarations sufficient to satisfy the May 6, 2004 order. *See* discussion *infra.* The declarations of the attorney-experts provided opinions regarding the damages Plaintiffs suffered. Such opinion evidence would have been admissible at trial. *See* HRE Rule 702 (stating in relevant part that, "[i]f scientific, technical, or other specialized knowledge will *assist the trier of*

---

**3.** The majority claims that this dissent "fails to take into account" that Plaintiffs were put on notice of the alternate theory of damages when Defendant filed its motion for summary judgment, majority opinion at 307, 172 P.3d at 1051 n.17, "baldly and mistakenly" stating that Plaintiffs' notice of Defendant's alternative measure of damages is not the equivalent of notice as to which measure of damages will govern the court's decision, *id.* (citing dissenting opinion at 314–15, 172 P.3d at 1058–59). The majority fails to take account of the relative impact of these events. It is true that Plaintiffs were put on notice that Defendant advocated a different standard of damages when the motion for summary judgment was filed, but that was the matter in dispute.

Defendant's motion for summary judgment did not constitute binding law that Plaintiffs were obligated to follow. Moreover, as noted *infra* at 322, 172 P.3d at 1066–67, Defendant did not produce any expert testimony indicating what it thought the relevant compromise factors should be such that Plaintiffs would believe it necessary to produce contending affidavits. Thus, to reiter-

ate, it was not until the court ruled on the motion for summary judgment that Plaintiffs were made aware of what the controlling law would be regarding damages for this case. They could not be expected to produce witness testimony relating to an unannounced standard under such circumstances.

The majority contends that Plaintiffs could have moved for a continuance under HCRP Rule 56(f) if they demonstrated a " 'need to discover essential facts' to justify their opposition." Majority opinion at 307, 172 P.3d at 1051 (quoting *Hall v. State of Hawaii*, 791 F.2d 759, 761 (9th Cir.1986) (brackets omitted)). However, Plaintiffs did not need additional evidence to justify their opposition to Defendant's motion for summary judgment. Plaintiffs' opposition was premised on a different standard of damages that was in contention with Defendant's standard at that point. In essence, the majority's position would require Plaintiffs to assume that Defendant would prevail on summary judgment and abandon their argument that the controlling standard was not the fair compromise value of the products liability claims.

*fact to understand the evidence* or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise[ ]" (emphasis added)). Plaintiffs having satisfied the court's deadline set forth in the May 6, 2004 order, and having submitted declarations admissible at trial, it would be patently unjust to hold Plaintiffs responsible for failure to meet a standard and to provide factors that had yet to be determined as controlling before the deadlines established for production of their expert opinions.

## V.

What was submitted by Plaintiffs should have been sufficient to preclude summary judgment. First, Plaintiffs provided economist-expert opinions as to what each Plaintiff could have claimed at trial as damages. Plaintiffs alleged damages in Exhibits 8 to 13 of their opposition memorandum. The damage amounts were for Pacific Paradise Orchids, Inc., $1,287,775; Jim McCully, $11,847,889; S. Taka, $649,871; Albert Isa Nursery, $967,222; Nakashima Farm, $547,276; and Hawai'i Orchids, $3,278,202. According to Plaintiffs, the economist-expert reports "measured the fraud injury by the damages that each Plaintiff could have claimed at trial of their Benlate claim, less the amount of settlement paid in fact, plus the effects of interest, giving a total value for the fraud and deceit claims."

Second, Plaintiffs' attorney-experts satisfied the mandate of the court's May 6, 2004 order. The attorney-experts' opinions would aid the jury and supported awarding Plaintiffs more than what they had received in settlement for their claims. Attorney-expert Judith A. Pavey stated that "the stronger the liability case, the more value both sides assign." Upon that proposition, she concluded that "[t]his evidence would have added confidence to my assessment of the risk of loss on liability, even had some prior jury trials resulted in findings for [Defendant] on liability issues." Pavey also stated, "I know for a fact that some of the cases that settled prior to our cases *would have either been settled* for substantially higher sums or *gone to tri-*

*al*[.]" (Emphases added.) According to Pavey, "added confidence" would have been provided by the evidence withheld, since "both sides" identified the strength of the "liability case" as a "risk" factor in settlement.

Attorney-expert Wayne Parsons opined that Plaintiffs "would have been in a stronger position regarding settlement," on the basis that "the strength of the liability case is directly proportional to the recommendation given to the client regarding compromising the total damages of the case when considering a settlement offer." The reference to "the strength of the liability" being in direct proportion to the settlement recommendation is obviously a factor regarding compromise.

Attorney-expert George W. Playdon, Jr. explained that "the concealment and/or misrepresentation of factual information by [Defendant] impaired my ability to fairly evaluate the status of my client's Benlate litigation." Playdon maintained that "this information would have made a substantial difference in my analysis regarding the strength of the liability/causation case against [Defendant]." According to Playdon:

11. ... If this information had been properly disclosed ..., I would not have recommended my client settle his claim for the amount [Defendant] offered during negotiations.

12. In my opinion, the value of my client's economic losses greatly exceeded the value of the settlement which was negotiated. In my opinion, assuming timely and appropriate access to all of the information represented by the aforementioned events and/or documents ..., *and further assuming* that in any mediation arbitration or settlement negotiations [Defendant] would not and did not offer any settlement consideration greater than that which was in fact paid to settle my client's underlying Benlate claim, I would have taken the claims before a jury.

(Emphasis in original.) Playdon proffered two factors bearing on a settlement. He opined that "timely and appropriate access to

all of the information" is a factor he would have considered in settlement. He also stated that since Defendant "would not and did not offer any settlement consideration greater than that which was paid," he would have gone to trial. Both the "access" and Defendant's unwillingness to settle may be viewed as factors affecting the fairness of any settlement.

Attorney-expert J. Richard Peterson said that "had [his Plaintiff] known in September 1994 all the information ..., he would have rejected [Defendant's] settlement paid to him and gone to trial." According to Peterson, "[t]he information, taken as a whole, would have greatly strengthened [his Plaintiff's] claim that the Benlate was defective and the cause of his [damages]." The "taken as a whole" impact of the information withheld— as opposed to the value of the case without such information—was a specific factor to consider as to the strength of Plaintiffs' claims and the fairness of the prior settlement.

Attorney-expert Jeffrey Portnoy concluded that "it is my view that had I been representing these claimants, the settlement value of the cases would have been dramatically impacted had the wrongfully withheld information been available." According to Portnoy, "[h]ad that information been available, the settlement value of the Hawaii cases would have been significantly increased." Like attorney-expert Parsons, Portnoy's settlement assessment would have been influenced by

the information "wrongfully withheld." Such an assessment would be a factor in determining the "settlement value" and, thus, would be a specific factor to be considered.

Here the attorney-experts opined that the settlement value was higher than that for which the case was previously settled. 'See *State v. Vliet*, 95 Hawai'i 94, 106, 19 P.3d 42, 54 (2001) (explaining that expert testimony must only, at minimum, "assist the trier of fact," and enhance the jury's ability to resolve that matter (citations omitted)). The opinions of Plaintiffs' attorney-experts, if accepted, would have the effect of establishing damages greater than the amounts for which Plaintiffs settled. *See id.*

The specific amount to be awarded, if any, was for the jury. *See, e.g., Auto. Underwriters, Inc. v. Rich*, 222 Ind. 384, 53 N.E.2d 775, 779 (Ind.1944) (explaining that a purpose of expert testimony is to give the jury "a method or means for measuring value," not that experts give such a value themselves). Expert testimony is intended "to *aid* the jury ... [to avoid] conjecture and speculation," and "like any testimony, the jury may accept or reject it." *Bachran v. Morishige*, 52 Haw. 61, 67, 469 P.2d 808, 812 (1970) (citations omitted) (emphasis added). The declarations of the attorneys, therefore, were sufficient to raise genuine issues of material fact as to what the reasonable settlement amount should be or what the "fair compromise value," *see* February 28, 2005 order, of a settlement would have been.[4] Under HRE Rule

---

4. Indeed, "[a]lthough an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir.1993) (citations omitted). Thus, "[w]here an expert presents 'nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected,' such testimony will be insufficient to defeat a motion for summary judgment." *Id.* (quoting *Mid-State Fertilizer v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989) (other citations omitted)).

The attorney-experts' declarations were based on a common factual basis, namely, that the fraudulently withheld evidence would have been critical in Plaintiffs' decisions to settle their prod-

ucts liability claims. *See supra* at 315–16, 172 P.3d at 1059–60. In addition, the experts explained their reasoning in reaching the opinion that that factual premise resulted in the conclusion that the fraudulent inducement to settle injured Plaintiffs. Specifically, the attorney-experts explained that the fraudulently withheld evidence increased the value of the case assigned by each side, impacted the "assessment of the risk of loss on liability[,]" and strengthened the liability case, which was directly proportional to the attorney's recommendation to the client regarding settlement value. *See supra* at 315, 172 P.3d at 1059. The experts opined more generally that, taken as a whole, the case against Defendant was stronger once Plaintiffs had knowledge of the withheld information, and the totality of the information would cause the attorney-experts to change their recommendation to their respective clients regarding Defendant's settlement offer. *See supra* at 315–16, 172 P.3d at 1059–60.

702, the testimony was admissible at trial as an aid to the jury's understanding of the evidence.[5]

## VI.

Based on the foregoing, Plaintiffs met their burden of showing genuine issues of material fact existed for trial. Even if the "fair compromise value" is used as the basis for calculating damages, Plaintiffs have sufficiently identified "compromise factors" to put the "fair compromise value" in issue, as noted *supra*. Plaintiffs' economic and attorney-expert submissions are aided by the directive that "evidence and inferences must be viewed [by this court] in the light most favorable to the non-moving" Plaintiffs. *French*, 105 Hawai'i at 466, 99 P.3d at 1050 (citation omitted).

Plaintiffs' experts' declarations, *see supra*, raise genuine issues of material fact as to the fairness of the prior settlement under the May 6, 2004 order and under the February 28, 2005 order. Plaintiffs did produce specific matters joining the issue of whether the prior settlement was reasonable or represented a fair compromise value for trial in light of Defendant's assertion that it would not have paid more than what was already paid. *See id.*

The actual amounts Plaintiffs previously settled for provide a point from which the jury may evaluate damages. Indeed, as stated above, Defendant's position is "that it would not have *actually paid more in settlement than it [already] did*." (Emphasis added.) Plaintiffs' economic reports provide an upper range for estimating the damages incurred by Plaintiffs. Plaintiffs' lawyer-experts opined that settlement should have

---

Thus, the majority's conclusion that these affidavits were insufficient to survive summary judgment based on a failure to establish damages, majority opinion at 305–306, 172 P.3d at 1049–50 n.14, is unconvincing.

In this case, the declarations of the attorney-experts, which opined that the settlement value was higher than that for which the case was previously settled, were clearly based on facts and inferences drawn thereon. Thus, the majority is incorrect in asserting that "the reports fail to set forth how those factors applied to each of their cases." Majority opinion at 306, 172 P.3d at 1050 n.14. The majority's categorization of the declarations of the attorney-experts as "unsubstantiated *conclusions*," majority opinion at 305, 172 P.3d at 1049 (emphasis added), is a unilateral inaccurate characterization, plainly contradicted by the declarations themselves.

To reiterate, the declarations, if accepted as true, would have the effect of establishing damages greater than the amounts for which Plaintiffs settled, thus raising genuine issues of material fact as to what the reasonable settlement amount should be or what the "fair compromise value" of a settlement would have been. The majority is also wrong in arguing that this "dissent fails to cite to any authority in support[.]" Majority opinion at 305, 172 P.3d at 1049 n.14. As noted *infra*, it is well established that "evidence and inferences must be viewed in a light more favorable to the non-moving party." *French*, 105 Hawai'i at 466, 99 P.3d at 1050.

5. The majority disagrees that the declarations of the attorney-experts would be admissible at trial under HRE Rule 702, positing that they "simply consisted of conclusory opinions" which would not provide "assistance to the jury...." Majority opinion at 306, 172 P.3d at 1050 n.14 (citing

*State v. Batangan*, 71 Haw. 552, 558, 799 P.2d 48, 52 (1990)). However, the declarations at issue in this case do not provide the type of conclusory legal opinion held inadmissible in *Batangan*. In that case, the expert witness implicitly testified that the Complainant in a child sexual abuse case was truthful and believable, a determination within the sole province of the jury. *Batangan*, 71 Haw. at 555, 799 P.2d at 50. Had the expert merely testified that the Complainant's behaviors that seemed contradictory to indicia of truthfulness, including delay in reporting and retracting the accusations, were consistent among child victims of sexual abuse by a family member, such testimony would have been admissible under HRE Rule 702 as helpful to the jury in reaching its determination regarding the credibility of a crucial witness. *Id.* at 557–58, 779 P.2d at 51–52. In the instant case, the declarations of the attorney-expert did not impinge on the jury's fact-finding authority. Rather, they were offered to assist the jury in determining whether Plaintiffs had settled for less than they should have as a result of Defendant's alleged fraud, and thus were admissible under HRE Rule 702.

Additionally, the majority's treatment of the attorney-experts' declarations creates the "Catch–22" Plaintiffs feared. The majority, like Defendant, would require Plaintiffs to submit expert testimony detailing the outcome of a hypothetical trial in which the wrongfully withheld evidence would be presented to the jury, but would then rule such evidence inadmissible under HRE Rule 702 as presenting nothing more than "conclusory opinions" that could not provide any assistance to the jury. Majority opinion at 306, 172 P.3d at 1050 n.14.

been at a level greater than that paid by Defendant. This would establish a range within which the jury could determine the fair compromise value of the claims.

## VII.

Finally, the "ultimate burden of persuasion ... always remains with the moving party and requires the moving party to *convince* the court that no genuine issue of material fact exists and that the moving party is entitled to summary judgment as a matter of law." *Id.* at 470, 99 P.3d at 1054 (citation omitted) (emphasis added). It would be ironic to sustain summary judgment in this case because apparently Defendant itself never named an expert attorney regarding "fair compromise value" factors prior to the expert deadline and before the court's summary judgment ruling.

Thus, Defendant did not provide expert lawyer testimony directed to the "numerous compromise factors and how they would have applied to each Plaintiff's case."[6] *See* February 28, 2005 order. As Plaintiffs note, "of [Defendant's] 20 experts, *not one was retained to opine on fair settlement value, or the economics of Plaintiffs' fraud claims. There is no reference anywhere in the massive record of this action of [Defendant] offering opinions on this subject matter.*"[7] (Emphasis added.)

Defendant's response is that, Defendant "need not submit any evidence if it chooses not to. [Plaintiffs] have that burden of proof." But on summary judgment, "the ultimate burden of persuasion ... always remains with [a] moving party" such as Defendant. *French,* 105 Hawai'i at 470, 99 P.3d at 1054 (citations omitted). Defendant did not produce any opposing attorney-expert declarations to those submitted by Plaintiffs even before the court determined on granting summary judgment that the measure of damages should be the fair compromise value and "compromise factors" were required to be identified by expert attorneys. On appeal, Defendant maintained "if [Plaintiffs] had provided proper expert testimony on settlement factors and methodologies, [Defendant]

---

**6.** The majority incorrectly implies this dissent points to the Defendant's failure to produce its own expert lawyer testimony in an attempt to shift the burden of proof. *See* majority opinion at 306, 172 P.3d at 1050 n.15 ("the burden is upon the [P]laintiffs to prove damages, and [P]laintiffs cannot complain that [Defendant] did not establish a prima facie element of the [P]laintiffs' case[]" (emphasis omitted)). Rather, the absence of any such evidence from Defendant underscores two major points. First, Plaintiffs were not actually put on notice of the numerous factors on which their attorney experts were subsequently required to opine in order to establish a prima facie showing of damages under the fair compromise value standard because the controlling standard was not settled until the court ruled on the motion for summary judgment. *See supra* at 313, 172 P.3d at 1057.

Second, Defendant did not establish that there was no genuine issue of material fact with regard to Plaintiffs' ability to prove the damages element of their fraud claim required of Defendants as the party moving for summary judgment. Defendant's theory on summary judgment was that even if the fraudulently withheld evidence had been disclosed to Plaintiffs, Defendant would not have paid more in settlement than it actually did. *Id.* Thus, under the well-established standard for summary judgment, Defendants were required to prove that, based on the identified compromise factors, there was no genuine issue of material fact that the value of Plaintiffs' claims would not have changed, such that Plaintiffs could not

prove that they were injured by Defendant's actions, *i.e.,* that Plaintiffs would be unable to establish the damages element of their fraud claim.

**7.** Plaintiffs contend also that Defendant took inconsistent and contradictory positions on the necessity of expert lawyer testimony under the fair compromise value standard. On the one hand, Defendant maintained that "the lawyer experts cannot 'tell' the jury what the evidence was on the day of the settlement ... nor can the lawyer expert 'tell' the jury the fair compromise value of [Plaintiffs'] case, as this would be usurping the function of the jury." But Defendant also argued that "[a]ssuming [Plaintiffs] could prove the fact of damage, *they would also have to prove the amount of damages with reasonable certainty.* The *amount of damages, if any, would be the fair compromise value* minus [Plaintiffs'] actual settlement amounts. *To make this deduction, the fair compromise value, obviously, would have to be known.*" (Emphases added.)

Defendant, however, went on to assert that, "[a]s discussed, *it is not the role of lawyer experts to opine on the fair compromise value*—that is for the jury's determination, with the necessary aid of experts to determine that amount." (Emphasis in original.) "In effect," as Plaintiffs argue, "[Defendant] sought a 'Catch–22': only testimony valuing a fictional settlement could satisfy Plaintiffs' burden of proof; but testimony valuing a fictional settlement was (according to [Defendant]) speculative and inadmissible."

would have submitted rebuttal testimony." [8] But as is noted, *Defendant itself had apparently not provided such expert testimony by the expert report deadline.*

The May 6, 2004 order stated that "experts will not be allowed to testify on any matters beyond their respective reports." Defendant in fact did not appear to have any "expert lawyer testimony directed to the numerous compromise factors, and how they would have applied to each Plaintiffs' case," *see* February 28, 2005 order, by the expert deadline, for trial. Accordingly, Defendant would have had no experts to identify compromise factors and would be left to rely on cross-examination (if it chose to cross-examine) of Plaintiffs' experts who were adverse to Defendant's position. Defendant's position regarding the necessity for such evidence was, at the least contradictory, in light of the fact that Defendant claimed, and the court *subsequently* agreed, that such evidence was central and pivotal to the case.

## VIII.

Against the foregoing record the majority reaches its result by mischaracterizing Plaintiffs' argument. The majority contends that "[t]he opportunity [to present further expert testimony at trial Plaintiffs] now seek ... was available to them, via [Hawai'i Rules of Civil Procedure (HRCP)] Rule 56(f) (2007), [9] at the time the [court] was considering [Defendant's] motion for summary judgment" based on the Plaintiffs' inability to prove damages. Majority opinion at 307, 172 P.3d at 1051. In fact, Plaintiffs did not maintain that they should be given additional time to present evidence that they did not submit at the motion for summary judgment. Rather, Plaintiffs indicated that "[b]ecause the possibility of the [court] imposing a limited 'settlement fraud' remedy was *unknown*

to the parties and was not foreseeable* under Hawaii law at the time Plaintiffs obtained their reports, and answered discovery" (emphasis added), if this court adopts Defendant's damage standard on appeal "as the prevailing measure of damages, [then] Plaintiffs request that they be given the opportunity (on remand) to make an appropriate record for such purpose."

Thus, Plaintiffs' request is merely that in conjunction with their argument for reversal of the summary judgment order, they be given the opportunity to present evidence on remand on the damages standard that is confirmed by this court on appeal that "was not foreseeable ... at the time Plaintiffs obtained their reports and answered discovery[.]" This is reasonable in light of the fact that the majority itself acknowledges, that until this case, "this court has not had the occasion to articulate what must be proven in order to bring a meritorious settlement fraud claim." Majority opinion at 293, 172 P.3d at 1037.

Accordingly, there was never any question that at the time Plaintiffs submitted their summary judgment papers "there was a need for a continuance[,]" as HRCP Rule 56(f) states, because as set forth above, at the time Plaintiffs and Defendant submitted their papers the appropriate damages standard had yet to be determined and, hence, the majority's posited need for a continuance had yet to ripen. The majority maintains that Plaintiffs "waived their opportunity to secure further [discovery] ... and cannot now raise it on appeal." Majority opinion at 309, 172 P.3d at 1053. But in fact, there was no reason for Plaintiffs to secure a HRCP Rule 56(f) continuance for "further discovery" since the purported need for such a continuance could only become apparent *after* the court decided

---

8. However, in the face of Plaintiffs' attorney-experts' declarations submitted before the court ruled on the appropriate damages measure, Defendant had the burden to respond to show that no genuine issue of material fact as to the fairness of settlement remained. Determination of that issue is one appropriately left for trial and the fact finder.

9. HRCP Rule 56(f) states:

Should it appear from the affidavits of a party opposing the motion that *the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance* to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
(Emphasis added.)

what damages standard would apply at the hearing.

## IX.

*Not surprisingly, then, HRCP Rule 56(f) is not raised by the Plaintiffs or by Defendant.* This is understandable because it was and is wholly irrelevant to the facts. Instead, it is the majority that raises HRCP Rule 56(f) *sua sponte* as the construct by which the majority rationalizes its outcome. Consequently, the majority's argument runs askew when it asserts that, "[h]ad the [HRCP Rule 56(f) ] motion been raised and a ruling made, the issue would properly be before this court to review whether the [court] abused its discretion in granting or denying the request." Majority opinion at 309, 172 P.3d at 1053 n.20.

Inasmuch as HRCP Rule 56(f) *was not* raised by any party but by the majority *sua sponte* (and through a misapplication of Plaintiffs' argument), under the circumstances it is *not properly* before this court as the majority acknowledges. *Id.* The majority's unilateral insertion of HRCP Rule 56(f) into this case not only clashes with the facts, but also with the law the majority itself cites. The majority's underlying premise (*i.e.,* "had the motion been raised") is also faulty inasmuch as the facts demonstrate there was no reason for the Plaintiffs to raise HRCP Rule 56(f).

Furthermore, in presenting an additional argument that would foreclose Plaintiffs' requested relief, the majority places itself in Defendant's position. In the circumstances of this case, by positing a HRCP Rule 56(f) argument that Defendant did not raise, the

majority has given Defendant another "bite at the apple," an advantage it expressly denied to Plaintiffs.[10] *See* majority opinion at 309, 172 P.3d at 1053–54 ("To permit the [P]laintiffs to now establish another record relating to the proof of damages ... would entitle them to two bites of the apple." (Citation omitted).). Plaintiffs have thus been doubly wronged.[11]

Plaintiffs could not have appropriately moved to continue the decision on Defendant's motion for summary judgment because the February 28, 2005 court order reiterated the court had precluded any further revision of expert testimony. The order confirmed that "[t]he *deadlines* for Plaintiffs to submit their final expert reports and amend their pleadings were October 15, 2004, and December 14, 2004, respectively." (Emphasis added.) The court then stated that it "previously made *clear* that the expert reports were to be *final*[.]" (Emphases added.) Thus, in deciding that "Plaintiffs are *therefore* unable to prove ... fraud damages as a matter of law," (emphasis added) the court made abundantly plain that it would not have considered any continuance under Rule 56(f) were that Rule even relevant to this case.

## X.

The majority's assertion that Plaintiffs should have moved for a Rule 56(f) continuance of the summary judgment hearing when Defendant's "theory of damages ... became clear[ ] upon the filing of its motion for summary judgment[,]" majority opinion at 307, 172 P.3d at 1051, is even more incongruous inasmuch as there was no way to anticipate *before* the hearing was held that the court

---

10. The majority misconstrues this dissent in reference to the majority's second bite at the apple comment. *See* majority opinion at 309–10, 172 P.3d at 1053–54 n.21. The point is not that Defendant will be another opportunity to prevail at trial, as the phrase is used by the ᴍᴀᴊᴏʀɪᴛʏ but, rather, in relation to the advantage given Defendant on this appeal. Defendant had the opportunity to assert any theory it chose to support the court's grant of summary judgment. It chose not to argue to this court that the Plaintiffs should have moved for a continuance under HRCP Rule 56. Thus, by injecting a new theory to support the majority's decision, the majority has afforded Defendant the basis for

prevailing on this appeal despite the fact that it was not argued by any party and, as noted *supra,* does not comport with the facts.

11. The majority contends that this dissent, in criticizing the application of HRCP Rule 56(f) in this case, ignores an appellant's burden of persuasion on appeal. Majority opinion at 309, 172 P.3d at 1053 n.21. However, given that HRCP Rule 56(f) was not raised before the court and therefore was not decided by the court, Plaintiffs cannot be reasonably or fairly required to convince this court that they are entitled to relief based on a then wholly hypothetical theory of the case.

would adopt Defendant's standard of damages and apply it to Plaintiffs' expert testimony.[12] The only opportunity Plaintiffs would have had to acquire expert testimony re-evaluating their fraud claims under the "reasonable settlement" standard would have been *after* the court made its February 28, 2005 order granting summary judgment. This is because it was not until that order was issued that the reasonable settlement amount was disclosed as the governing standard for damages. The order determined that "[i]f (s)he chooses to sue for fraud, the remedy available to Plaintiffs is the fair compromise value of the claim at the time of settlement."

Until the February 28, 2005 order, Plaintiffs could only maintain—as they always had—that their damages should be measured up to the judgment value of their claims.

Indeed, the court's May 5, 2004 order mandated Plaintiffs to "state their position on the introduction of evidence at trial relating to the issue of whether Benlate was defective and/or contaminated." The February 28, 2005 order thus barred the possibility of a continuance for further discovery.[13]

The majority disagrees that "the only opportunity [Plaintiffs] would have had to acquire expert testimony re-evaluating their fraud claims ... would have been *after* the court made its February 28, 2005 order granting summary judgment[ ]" because of "the remedy available pursuant to HRCP Rule 56(f)[.]" Majority opinion at 309, 172 P.3d at 1053 n.20. As pointed out before, *the defect in this reasoning is that Plaintiffs would have needed to know what specific standard the court would eventually decide*

**12.** On this point, the federal cases cited by the majority for the proposition that a party who fails to move for relief under Federal Rules of Civil Procedure (FRCP) Rule 56(f) cannot be awarded relief in the form of additional discovery on appeal are distinguishable. *See* majority opinion at 308–09, 172 P.3d at 1052–53. The majority cites to *Weinberg v. Whatcom County,* 241 F.3d 746, 751 (9th Cir.2000), in which the Ninth Circuit Court of Appeals held that the district court properly awarded summary judgment in favor of defendants because the plaintiff did not move for additional time "to obtain expert testimony necessary to substantiate his allegations of damages" under FRCP Rule 56(f). But notably, in *Weinberg,* the plaintiff did not file *any* expert testimony regarding his damages by the deadline set by the district court. *Id.* at 750. Thus, there was absolutely no evidence that could possibly establish the damages element of the plaintiff's claim. *Id.* Furthermore, the plaintiff was fully aware that he needed to submit such evidence, inasmuch as he asked for the district court's "indulgence" to submit an untimely report, but never formally moved for a continuance under FRCP Rule 56(f). *Id.*

In contrast, Plaintiffs in this case had submitted expert reports regarding damages in compliance with the court's May 6, 2004 order and the then-prevailing measure of damages. Plaintiffs, unlike Weinberg, had no reason to suspect that they required more time to gather expert evidence to support their claim. Therefore, the application of *Weinberg* in this case is inappropriate.

The majority also cites to *Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 832–33 (10th Cir.1986), holding that "where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by [FRCP]

Rule 56(f) ... there is no abuse of discretion in granting summary judgment[.]" Majority opinion at 308–09, 172 P.3d at 1052–53. However, *Pasternak* is inapposite to the present case. In *Pasternak,* the Tenth Circuit Court of Appeals rejected the defendant's argument that when the trial court is aware of a party's need to conduct more discovery by virtue of other events in the litigation, strict compliance with FRCP Rule 56(f) is not required. *Pasternak,* 790 F.2d at 833.

In contrast, in this case, other events in the course of litigation would not have apprised the court of Plaintiffs' need to conduct additional discovery *before* it ruled on the summary judgment motion, thus triggering the rule in *Pasternak.* The event that necessitated the additional discovery was the court's ruling that the applicable standard of damages was the fair compromise value. Once that ruling was made, and Plaintiffs learned that they would need additional attorney expert testimony beyond what they submitted by the October 15, 2004 deadline for final expert reports (a fully four months before Defendant filed its motion for summary judgment), a HRCP Rule 56(f) continuance was no longer available to Plaintiffs.

**13.** To make clear, the majority states that, "by the time the [court] entered its ruling on [Defendant's] summary judgment, *i.e.,* on February 28, 2005, the discovery cut-off had not yet expired[ ]" inasmuch as "[t]he discovery cut-off date was set for April 14, 2005." Majority opinion at 308, 172 P.3d at 1052 n.18. However, the majority fails to indicate that the deadline for Plaintiffs to submit their final expert reports was on *October 15, 2004,* and the court's February 28, 2005 order made it evident that the court had "previously made clear that the expert reports were to be final[.]"

*governed in order to have a basis for request-ing a continuance pursuant to HRCP Rule 56(f) in order to conduct further discovery.*

The majority contends that it "is nothing more than mere speculation" that the court would have denied any motion for further discovery. Majority opinion at 309, 172 P.3d at 1053 n.20. Obviously, a court, in its discretion, may grant or deny a request for continuance pursuant to HRCP 56(f). *See 808 Dev., LLC v. Murakami,* 111 Hawai'i 349, 355, 141 P.3d 996, 1002 (2006) ("A circuit court's decision to deny a request for a continuance pursuant to HRCP Rule 56(f) will not be reversed absent an abuse of discretion." (Brackets and citation omitted.)). In other words, even if Plaintiffs requested a continuance, there is no assurance that the court would have granted it. Thus, the irony of the majority's position is that it itself speculates that the court might have granted a Rule 56(f) continuance.

That aside and more to the point, again, the majority ignores the manifest language of the court's order granting Defendant's summary judgment motion that "the expert reports were to be *final* and that *the experts would not be allowed to testify on matters beyond their respective reports*[.]" As indicated *supra,* per the court's February 28, 2005 order, it was not disposed to grant any motion for further discovery even if Plaintiffs moved for such discovery. The court plainly related in its February 28, 2005 order that it would not have considered any continuance. To decide as the majority does is to question the credence of the court's orders.

The court first set the expert deadline in its May 5, 2005 Order Relating to Trial Procedures. That the court stated the deadline

in two orders is telling of their conclusiveness. To say, then, that Plaintiffs should have moved to continue once Defendant filed its motion for summary judgment is to fault Plaintiffs for following the court order—an order which was specifically designed to reduce litigation clutter and delay.

## XI.

Manifestly, it is the lack of *notice* that Defendant's measure of damages would control the parameters of expert testimony that unfairly prejudices Plaintiffs here. Until the court entered its February 28, 2005 order, Plaintiffs had no notice that the "reasonable settlement amount" was the measure by which its attorney-experts would have to evaluate the case. The majority's position that it was not unforeseeable that the court would rule in favor of Defendant on summary judgment, majority opinion at 309, 172 P.3d at 1053–54 n.21, does not address the central issue here, namely that when Plaintiffs submitted their final expert reports, they were not on notice of the governing measure of damages subsequently announced in the court's February 28, 2005 order.

What makes the majority's position even more egregious is that Defendant, while maintaining the reasonable settlement amount as the measure of damages, *never produced expert testimony applying such a standard* and, thus, there was no reason for Plaintiffs to request a Rule 56(f) continuance of the summary judgment hearing to respond to non-existent affidavits applying such a standard.[14] Hence, the illogic of the majority's position is that, until the court designated the appropriate measure of damages as to which the attorney-experts were to opine,

**14.** The majority contends that "[Defendant], as the party moving for summary judgment, 'need not support [its] motion with affidavits or similar materials that negate [Plaintiffs'] claims, but need only point out that there is [an] absence of evidence to support [Plaintiffs'] claims.'" Majority opinion at 306, 172 P.3d at 1050 n.15 (quoting *Young v. Planning Comm'n of County of Kauai,* 89 Hawai'i 400, 407, 974 P.2d 40, 47 (1999)). First, placed in context, the majority's quotation from *Young* comes from a parenthetical in which this court drew a *comparison* to the Federal Rules of Civil Procedure. *See Young,* 89 Hawai'i at 407, 974 P.2d at 47, not supporting

authority (stating that "a party moving for summary judgment under [FRCP] Rule 56 need not support his or her motion with affidavits or similar materials that negate his or her opponent's claims, but need only point out that there is absence of evidence to support the opponent's claims" (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986))). Second, as reiterated before, *until the appropriate damages standard was established by the court, the declaration plainly raised genuine issues of fact as to the proper damages calculations as to which Defendant was obligated to respond.*

Defendant could not discharge its burden, as the majority asserts, simply by pointing to a lack of evidence produced by Plaintiffs, majority opinion at 306, 172 P.3d at 1050 n.15, because such a contention *presupposes* the existence of an established measure of damages as to which "any absence of evidence" would be compared—and the court had yet to adopt such a measure. The majority is incorrect, then, in alleging that the Plaintiffs failed to discharge their burden. *See* majority opinion at 305–06, 172 P.3d at 1049–50 n.14. To fault Plaintiffs *ex post facto* for producing only expert testimony directed to their proposed standard of damages and not directed to Defendant's proffered measure impermissibly deprives Plaintiffs of their right to a trial on their claims.

### XII.

Under the circumstances above, it cannot be reasonably concluded that Plaintiffs had notice of the standard the court would impose on the evidence they had marshaled in opposition to Defendant's summary judgment motion, or that Defendant has "convinc[ingly,]" established its entitlement to summary judgment. *French*, 105 Hawai'i at 470, 99 P.3d at 1054 (citation omitted). With all due respect, although I believe the court acted conscientiously, summary judgment should not have been granted. Accordingly, I would vacate the February 28, 2005 order and remand the case for further proceedings.